IN THE SUPREME COURT OF NORTH CAROLINA

No. 277A13

FILED 25 SEPTEMBER 2015

WILLIAM T. USSERY and wife, CAROLYN B. USSERY

v.

BRANCH BANKING AND TRUST COMPANY

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 743 S.E.2d 650 (2013), reversing and remanding an order granting summary judgment for defendant entered on 16 April 2012 by Judge W. David Lee in Superior Court, Richmond County. Heard in the Supreme Court on 7 January 2014.

*Anderson, Johnson, Lawrence & Butler, L.L.P., by Stacey E. Tally and Steven C. Lawrence, for plaintiff-appellees.*

*Bell, Davis & Pitt, P.A., by Michael D. Phillips and Kevin G. Williams, for defendant-appellant.*

NEWBY, Justice.

In this case we consider whether a plaintiff may recover against his bank for its failure to provide a government-backed business loan when, after learning no such loan was available, plaintiff sought and obtained a new commercial loan with the same bank and subsequently expressly waived all offsets and defenses. Plaintiff's claims arise in contract and in tort, and all of them rely upon one key date: the date on which plaintiff was made aware no government-backed loan was available. In his

complaint plaintiff alleges that he incurred his indebtedness in anticipation of receiving a government-backed loan as promised by his bank. The undisputed facts, however, show that plaintiff chose to obtain a new commercial loan after learning no government-backed loan was available, and he repeatedly reaffirmed his obligations under the commercial loan and expressly waived any offsets and defenses to the loan and against the bank. Therefore, the trial court properly granted summary judgment for defendant, and the decision of the Court of Appeals is reversed.

Viewing the facts in the light most favorable to plaintiff, the nonmoving party, the record reveals the following: In 1998 plaintiff William "Pete" Ussery[1] and his business partner, D. Wayne Barker, launched a venture to establish a furniture assembling business. Barker had years of managerial experience at CAFCO Industries, Inc. (CAFCO), a local chair manufacturer, and plaintiff had greater financial resources, was a seasoned real estate developer and businessman, and sat on the board of a bank. In response to a decrease in sales, CAFCO was in the process of closure and liquidation, and the owners had approached plaintiff to discuss the sale of the company's old manufacturing building (the CAFCO building).

---

[1] Plaintiffs are William Ussery and his wife, Carolyn Ussery. The record reflects that William Ussery was the primary actor in the following events, and we refer to him in the singular as "plaintiff" for clarity.

Plaintiff and Barker formed their business, Chair Specialists, Inc.,[2] with plaintiff holding sixty percent of the equity and Barker holding the remaining forty percent. According to their business plan, Barker would run the day-to-day operations and plaintiff would provide the startup capital to fund the enterprise. Plaintiff planned to individually purchase the CAFCO building and develop it into residential condominiums, and the operations of Chair Specialists would be housed in a different location. The long-range plan was for Barker to obtain a government-backed business loan with which to purchase plaintiff's interest in Chair Specialists and repay plaintiff for the startup expenses.

In November 1999, plaintiff bought equipment from CAFCO to use at Chair Specialists. For $150,000 plaintiff also purchased the "Cheraw Road Building,"[3] a commercial facility in Hamlet, North Carolina, to house Chair Specialists' operations. The Cheraw Road Building had been contaminated with lead and required clean up and abatement; moreover, following remediation of the property, the building would serve as collateral for any future business loan. Plaintiff transferred ownership of the Cheraw Road Building to Chair Specialists and retained a deed of trust on the property. Plaintiff then purchased, individually, the CAFCO Building for approximately $100,000.

---

[2] The business is referred to as "Chair Specialists" and "Chair Specialties" interchangeably throughout the record.

[3] The Cheraw Road Building is also referred to as the "Tartan Building" throughout the record.

Plaintiff alleges that sometime in 1999, Barker and he first met with Wiley Mabe, a commercial lending officer for Branch Banking and Trust Company (BB&T), to discuss their business plan and learn about available government-backed loans. Mabe allegedly reviewed the business plan and assured plaintiff and Barker that Barker and Chair Specialists would qualify for and receive a $450,000 small business, government-backed loan.

Between 1999 and 2001, plaintiff obtained three commercial loans from BB&T for the startup of Chair Specialists and to reimburse himself for his purchases. The loans were in the amounts of (1) $100,000 on 6 December 1999, with plaintiff and Barker as debtors; (2) $50,000 on 25 February 2000, with Chair Specialists as debtor and plaintiff and Barker as guarantors; and (3) $125,000 on 21 February 2001, with plaintiff and his spouse as debtors.

By January 2002, Mabe notified all parties that no government-backed loan was available, nor would BB&T extend a long-term loan to them. According to plaintiff, Barker and he had inquired into the status of the application frequently and were repeatedly assured that they would receive the loan. Upon further inquiry, Barker discovered that neither he nor the business could qualify for a government-backed loan elsewhere because of the additional debt incurred between 1999 and 2001. The Small Business Administration (SBA) advised Barker that Mabe had not

submitted the application documents to the SBA because Mabe did not believe Barker would qualify for a loan.

Knowing that no government-backed loan was available, plaintiff and Barker closed Chair Specialists in early 2002 and set about selling the accompanying real and personal property. According to Barker, plaintiff then approached BB&T to inquire about a single loan to consolidate his debts associated with the business and reduce his monthly expenditures while he attempted to sell the company's assets. On 18 April 2002, fully aware that no government-backed loan was available and that he had various potential causes of action against BB&T, plaintiff nonetheless obtained a commercial loan of $425,000 from BB&T (the $425,000 Note). The $425,000 Note provided in part: "For value received, the undersigned . . . promises to pay to Branch Banking and Trust Company . . . the sum of . . . $425,000.00 . . . ." The $425,000 Note secured a one-year, interest-only loan, with accrued interest payments due quarterly, and was payable in full on 18 April 2003. As a condition of the loan, BB&T required Barker to issue a $122,000 promissory note to plaintiff. After paying off the antecedent debts, plaintiff personally received $99,187.75 in cash proceeds from the $425,000 loan.

On 15 April 2003, fifteen months after learning that no government-backed loan was available and one year after executing the $425,000 Note, plaintiff entered into the first of a total of six promissory note modification agreements. In the first

modification BB&T agreed to extend the maturity date of the $425,000 Note by an additional year and allowed plaintiff to continue making quarterly, interest-only payments. In exchange, plaintiff reaffirmed his payment obligation and waived any offsets and defenses against the Note or the bank.

All six note modification agreements contained express and unambiguous language to this effect:

> [A]ll other terms, conditions, and covenants of [the $425,000 Note] remain in full force and effect, and . . . all other obligations and covenants of Borrower(s), except as herein modified, shall remain in full force and effect, and binding between Borrower(s) and [the] Bank . . . .
> . . . .
>
> . . . The original obligation of the Borrower(s) as evidenced by the [$425,000 Note] above described is not extinguished hereby. It is also understood and agreed that except for the modification(s) contained herein said [$425,000 Note] . . . shall be and remain in full force and effect. . . . Borrower and Debtor(s)/Grantor(s), if any, jointly and severally consent to the terms of this Agreement, *waive any objection thereto, affirm any and all obligations to Bank and certify that there are no defenses or offsets against said obligations or the Bank*, including without limitation the [$425,000 Note].

(Emphasis added.) Plaintiff was current on the interest-only payments required under the $425,000 Note at the time of his first loan modification, and he continued to make quarterly interest payments through 27 April 2006.

In May 2003, just over a month after the execution of plaintiff's first note modification, Barker filed suit against BB&T (the Barker litigation) for its alleged misrepresentations and failure to use reasonable efforts to obtain a government-

backed loan for Chair Specialists. Barker's complaint stated claims of negligence, breach of contract, and breach of fiduciary duty. According to plaintiff, after the Barker litigation commenced, plaintiff discussed with BB&T that he was contemplating filing a separate suit against the bank or joining the Barker litigation as an additional party. Plaintiff alleges that BB&T, through its agent Charles Smith, told him "everything would be worked out in the Barker litigation" and there was no need to join the Barker litigation or bring a separate action. Plaintiff contends that BB&T further promised that "the [$425,000 Note] would be canceled upon resolution of the [Barker litigation]. . . . [T]he loan would be forgiven, and [plaintiff] would be reimbursed any expenses incurred related to BB&T's failure to obtain the [government-backed loan]." Plaintiff admits, however, that "no agents or employees of BB&T ever proposed a specific plan for resolving the issues."

Thereafter, on 25 May 2004, plaintiff executed his second modification of the $425,000 Note, which contained provisions identical to the first, but extended the maturity date to 25 February 2005. It allowed plaintiff to continue interest-only payments, affirmed plaintiff's continuing obligation to repay the debt, and waived any offsets and defenses. Plaintiff was current on his interest payments at that time.

On 21 March 2005, plaintiff executed his third modification of the $425,000 Note, which, except for extending the loan maturity date to 20 March 2006, contained provisions identical to the first two modifications, allowing plaintiff to continue

quarterly interest-only payments, affirming plaintiff's obligation to repay the debt, and waiving any offsets and defenses. Plaintiff was current on his interest payments at that time.

Around 20 April 2006, the Barker litigation settled confidentially.

On 26 April 2006, plaintiff executed his fourth modification of the $425,000 Note, which extended the loan maturity date several months to 25 June 2006 and now allowed plaintiff to accrue all interest due until maturity. The modification contained provisions identical to its three predecessors affirming plaintiff's obligation to repay the debt and waiving any offsets and defenses. Plaintiff remained current on his interest payments at that time.

In the summer of 2006, plaintiff consulted legal counsel, apparently for the first time. BB&T had not cancelled the $425,000 Note, and plaintiff was denied access to the terms of the Barker litigation settlement. On 5 July 2006, plaintiff and his counsel first met with BB&T representatives and agreed to discuss resolution of the matter.

On 24 July 2006, plaintiff executed his fifth modification of the $425,000 Note, which extended the loan maturity date several more months to 22 October 2006, allowed plaintiff to continue to accrue interest, and contained provisions identical to

the former modifications affirming plaintiff's obligation to repay the debt and waiving any offsets and defenses. Plaintiff was current on his interest payments at that time.

According to plaintiff, on 17 October 2006, "having not received a settlement proposal from BB&T," his counsel wrote BB&T and demanded cancellation of the $425,000 Note, plus compensation for interest, costs, and expenses incurred in acquisition of the Cheraw Road Building and for startup and financing costs related to Chair Specialists. BB&T responded by e-mail on 20 October 2006. BB&T held a deed of trust on the Cheraw Road Building as collateral for the $425,000 Note, and the bank sought to conduct an environmental inspection and assess the value of the property. BB&T requested confirmation that the parties understood that they would "let the environmental inspections, appraisals, etc. run their course to see where we are," and, as related to the $425,000 Note, reiterated that "[a]nything of substance would have to come through the regional offices here first."

Plaintiff's counsel agreed to that understanding on 23 October 2006 and noted in his e-mail to BB&T's representative that he would await "completion of the environmental assessment and BB&T's decision relative to the subject transaction and [plaintiff's] position on the matter before acting further." Around this time and continuing into 2007, plaintiff allowed contractors retained by BB&T to have access to the Cheraw Road Building to conduct their environmental inspections and assessments.

On 21 November 2006, plaintiff executed his sixth and final modification of the $425,000 Note, which extended the loan maturity date several additional months to 19 February 2007, allowed plaintiff to continue to accrue interest, and contained provisions identical to the former modifications affirming plaintiff's obligation to repay the debt and waiving any offsets and defenses.

In April 2007, in an unrelated, separate loan transaction, BB&T denied plaintiff's request to extend a loan on a different commercial property because, according to plaintiff, BB&T was "looking at writing off approximately '$160,000.00 on the [$425,000 Note].' "[4]

On 14 August 2007, over five and a half years after plaintiff's evidence shows he first became aware that no government-backed loan was available, plaintiff's counsel wrote BB&T and demanded that the bank "cancel the $425,000.00 Note as satisfied" and "reimburse [plaintiff] the sum of $192,812.00," for a total of $617,812.00, in exchange for which plaintiff would convey the Cheraw Road Building to BB&T; otherwise, plaintiff would initiate a lawsuit. Plaintiff's counsel noted that "this is a very reasonable settlement proposal." BB&T's counsel rejected plaintiff's demand outright, noting in a letter dated 14 January 2008 that plaintiff's claims are

---

[4] For internal accounting purposes BB&T did write down the indebtedness by $180,000, but the internal entries did not alter plaintiff's $425,000 Note or his repayment obligations, and plaintiff has not alleged otherwise. As plaintiff has asserted in his complaint, any harm remains founded on BB&T's alleged failure to obtain the government-backed loan.

"without merit and clearly time-barred," but he expressed a willingness to work towards a resolution of BB&T's potential claims against plaintiff. Counsel's letter included a counterproposal giving plaintiff six months to sell the Cheraw Road Building and, after applying the proceeds from that sale to the $425,000 Note, allowing plaintiff to pay eighty-five percent of any deficiency balance remaining in twenty-four equal monthly installments, without interest.

On 25 June 2008, six years and five months after plaintiff first became aware that no government-backed loan was available, plaintiff filed his complaint asserting seven causes of action, each of which incorporates by reference and is based in part upon the following allegations:

> 9.      On or about April 18, 2002, based upon the assurances that Barker and Chair Specialties would quality [sic] for a business loan, Plaintiffs obtained a $425,000 loan from BB&T, signing a promissory note in said amount payable to BB&T in full upon its maturity on April 18, 2003, with accrued interest payable on a quarterly basis through maturity. As collateral for the loan, the Plaintiffs granted a Deed of Trust to BB&T in the amount of $425,000.00, with the Cheraw Road building as collateral, and also entered into a Security Agreement with BB&T.
>      . . . .
>
> 11.      Plaintiffs allege under information and belief that with the start up of Chair Specialties and the securing of a $450,000.00 [government-backed loan] by Barker and Chair Specialties, that Barker and Chair Specialties would be able to pay in full the Promissory Note issued by the Plaintiffs to Barker and his wife, and also pay off the $425,000.00 business loan obtained by the Plaintiffs for the start up of Chair Specialties.
>
> 12.      On April 18, 2002 notes and closing documents were all executed with the knowledge of Mabe and BB&T, and under the full

assurance to the Plaintiffs that the business loan for Chair Specialties would be approved.

13.    Plaintiffs allege upon information and belief that within the weeks that followed the April 18, 2002 closing on the $425,000.00 loan from BB&T to the Plaintiffs, Barker contacted Mabe to obtain a status on the paperwork for the Chair Specialties business loan, and upon his inquiry, Mabe within the course and scope of his authority with BB&T, assured Barker that the loan paperwork was "on track" and that the loan would be approved.

14.    Plaintiffs allege upon information and belief that in January of 2003, Mabe called Barker and informed him that he had bad news, and that much to Mabe's surprise, the [government-backed] loan had been denied.
. . . .

33.    Defendants have failed and refused to cancel the [$425,000 Note] and reimburse the Plaintiffs for expenses incurred based upon the Defendant's breach and failure to procure original financing for Chair Specialties and Barker.

In essence, plaintiff argues in his complaint that he sought the $425,000 loan as a "bridge loan" to be repaid with the proceeds of the anticipated $450,000 government-backed loan.  Unable to repay the $425,000 Note with funds from the expected $450,000 government-backed loan, plaintiff asserts the following claims: (1) negligence, (2) negligent misrepresentation, (3) breach of contract, (4) unfair and deceptive trade practices, (5) breach of fiduciary relationship, (6) breach of BB&T's duty of good faith dealing, and (7) fraud.  In addition to compensatory damages, plaintiff requested punitive damages and a declaratory judgment voiding the $425,000 Note and cancelling the bank's deed of trust on the Cheraw Road Property.

Despite the foundational allegation in the complaint that plaintiff obtained the $425,000 loan in reliance upon a representation that the government-backed loan was forthcoming, the actual facts established by plaintiff's own affidavit and discovery, and by the affidavit of his business partner Barker, are that BB&T had already notified plaintiff that no such government-backed loan was available by January 2002, several months before plaintiff obtained the $425,000 loan in April 2002. Plaintiff has not filed a motion to amend his pleading.

In its answer BB&T raised the statutes of limitation[5] as an affirmative defense and filed a compulsory counterclaim to collect the outstanding principal and interest owed on the $425,000 Note. In plaintiff's reply to BB&T's counterclaim, he pled, as one of his affirmative defenses, the claims from his complaint, stating that "Plaintiffs plead and rely upon the original claims set forth in their Complaint as a bar to the Counterclaim."[6]

---

[5] Plaintiff's claims for negligence, negligent misrepresentation, breach of contract, breach of fiduciary relationship, breach of duty of good faith and fair dealing, and fraud are subject to a three-year statute of limitations. N.C.G.S. § 1-52(1), (5), (9) (2013). Plaintiff's unfair and deceptive trade practices claim is subject to a four-year statute of limitations. *Id.* § 75-16.2 (2013). Based on the purported claims having arisen in January 2002, the three-year statute of limitations would have run in January 2005, and the four-year statute of limitations would have run in January 2006.

[6] Plaintiff raises seven defenses in his reply to BB&T's counterclaim. First, plaintiff does not dispute execution of the $425,000 Note or the accompanying six modification agreements or the benefits therein, but denies he is in default. He then asserts six affirmative defenses: (1) "unclean hands," (2) "modification and novation," (3) "laches," (4) "waiver and estoppel," (5) "Defendant's failure to mitigate," and (6) "the original claims set forth in [plaintiff's] Complaint."

On 15 December 2011, BB&T moved for summary judgment on the grounds that, *inter alia*, there is no genuine dispute of material fact regarding plaintiff's indebtedness under the $425,000 Note or that plaintiff's claims are time-barred. On 16 April 2012, the trial court granted summary judgment in favor of BB&T, concluding that BB&T is entitled to damages of $645,382.79, plus costs and interest, and attorney fees. On appeal, plaintiff argued, *inter alia*, that the record establishes a genuine issue of material fact whether BB&T should be equitably estopped from asserting the statutes of limitation defense and whether the promissory note and deed of trust are enforceable. BB&T reiterated its argument that plaintiff's claims are in fact time-barred and that it is entitled to summary judgment on the $425,000 Note.

In a divided opinion, the Court of Appeals held that the events alleged by plaintiff raised an inference that BB&T was equitably estopped from asserting the statutes of limitation as a defense when its assurances to plaintiff may have induced his delay in filing suit and reversed the trial court's grant of defendant's motion for summary judgment. *Ussery v. Branch Banking & Trust Co.*, ___ N.C. App. ___, ___, 743 S.E.2d 650, 658 (2013). The dissent rejected the majority's equitable estoppel analysis, concluding that no genuine issue of material fact existed regarding plaintiff's claims and that BB&T's alleged "assurances" were "nothing more than mere 'promises' that Defendant would work to resolve Plaintiff's claims in the future." *Id.* at ___, 743 S.E.2d at 659 (Dillon, J., concurring in part and dissenting in part).

The dissent noted that, in any event, "the alleged oral 'assurance' [by BB&T] that the [$425,000 Note] would not have to be paid back under any circumstance is in *direct contradiction* to the terms of the six written [modification] agreements executed by Plaintiff." *Id.* at ___, 743 S.E.2d at 661. Nonetheless, the dissent agreed with the majority that a genuine issue of material fact remained regarding the amount of interest accrued on the $425,000 Note, for which defendant sought recovery in its counterclaim.[7] *Id.* at ___, ___, 743 S.E.2d at 658-59, 662.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2013). The movant is entitled to summary judgment: (1) "where a claim or defense is utterly baseless in fact," or (2) when only a question of law arises based on undisputed facts. *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 533, 180 S.E.2d 823, 829 (1971) (citations omitted). "All facts asserted by the [nonmoving] party are taken as true and . . . viewed in the light most favorable to that party." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). This Court reviews appeals from summary

---

[7] This final issue was not appealed by either party and is not before this Court. *See, e.g.*, *Town of Midland v. Wayne*, ___ N.C. ___, ___, 773 S.E.2d 301, 305-06 (2015) (recognizing that when a party has not sought further review of an issue, the decision of the Court of Appeals on that matter is final).

judgment de novo. *Dallaire v. Bank of Am.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014) (citations omitted).

A genuine issue of material fact "is one that can be maintained by substantial evidence." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835 (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Thompson v. Wake Cty. Bd. of Educ.*, 292 N.C. 406, 414, 233 S.E.2d 538, 544 (1977) (quoting *State ex rel. Comm'r of Ins. v. N.C. Fire Ins. Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977)), and means "more than a scintilla or a permissible inference," *id.* at 414, 233 S.E.2d at 544 (quoting *State ex. rel. Comm'r of Ins. v. N.C. Auto. Rate Admin. Office*, 287 N.C. 192, 205, 214 S.E.2d 98, 106 (1975)). When the proof offered by either party establishes that no cause of action or defense exists, summary judgment may be granted. *Kessing*, 278 N.C. at 535, 180 S.E.2d at 830 (citation omitted).

It is undisputed that, several months after plaintiff became aware that the desired government-backed loan was unavailable and thus learned of his potential claims against BB&T, he nonetheless sought and obtained a new $425,000 loan from BB&T, thereby consolidating his existing debts and giving him $99,187.75 in additional cash. The record reveals no misrepresentation inducing plaintiff to obtain this loan. Plaintiff then executed a series of six modifications, all of which

unambiguously reaffirmed the $425,000 Note obligation and expressly waived any offsets and defenses against the indebtedness or the bank.

BB&T is entitled to summary judgment on its counterclaim seeking repayment of the $425,000 Note because, relying on the contractual terms of the loan documents, plaintiff repeatedly reaffirmed his indebtedness and expressly waived his defenses and offsets. Likewise, because plaintiff's own claims incorporate and rely upon his indebtedness, comprised of both the $425,000 Note and subsequent modifications, plaintiff's waiver necessarily included his claims, and summary judgment for BB&T on that basis is proper. Moreover, plaintiff's claims as pled in his complaint rely upon the premise that the $425,000 Note was a "bridge loan" obtained before he knew the government-backed loan was not available, but his own evidence directly contradicts this assertion.

In interpreting contracts, we construe them as a whole. *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629, 588 S.E.2d 871, 875 (2003) ("The various terms of the [contract] are to be harmoniously construed . . . ." (alteration in original) (quoting *Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000))). Each clause and word is considered with reference to each other and is given effect by reasonable construction. *Sec. Nat'l Bank of Greensboro v. Educators Mut. Life Ins. Co.*, 265 N.C. 86, 93, 143 S.E.2d 270, 275 (1965) ("[A] paragraph or excerpt must be interpreted in context with the rest of the agreement."

(quoting 1 Strong's North Carolina Index: *Contracts* § 12, at 585 (1957))). We determine the intent of the parties by using "the plain meaning of the written terms." *RL REGI N.C., LLC v. Lighthouse Cove, LLC,* 367 N.C. 425, 428, 762 S.E.2d 188, 190 (2014) (citing *Powers v. Travelers Ins. Co.*, 186 N.C. 336, 338, 119 S.E. 481, 482 (1923)). Contracting parties understand that "liability to the burden is a necessary incident to the right to the benefit." *Id.* at 428-29, 762 S.E.2d at 190 (quoting *Norfleet v. Cromwell,* 70 N.C. 510, 516, 70 N.C. 633, 641 (1874) (citations omitted)). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners . . . ." *Carolina Power & Light Co. v. Bowman*, 229 N.C. 682, 693-94, 51 S.E.2d 191, 199 (1949) (Stacy, C.J., dissenting) (citations omitted). One who executes a written instrument is ordinarily charged with knowledge of its contents, *see, e.g.*, *Mills v. Lynch,* 259 N.C. 359, 362, 130 S.E.2d 541, 543-44 (1963), and he may not base his action on ignorance of the legal effect of its provisions in the absence of considerations such as fraud or mistake, *Pierce v. Bierman,* 202 N.C. 275, 279, 162 S.E. 566, 568 (1932).

"Parties are [generally] free to waive various rights, including those arising under statutes." *RL REGI*, 367 N.C. at 428, 762 S.E.2d at 190 (citations omitted). "Waiver is the intentional relinquishment of a known right," and as such, "knowledge of the right and an intent to waive it must be made plainly to appear." *Brady v. Funeral Benefit Ass'n*, 205 N.C. 5, 7, 169 S.E. 823, 824 (1933) (citation omitted). A debtor who, on the one hand, acknowledges his debt obligations and waives any

defenses against that obligation cannot, at the same time, claim he reasonably relied on contemporaneous assurances that the very same debt would be canceled. *See Int'l Harvester Credit Corp. v. Bowman*, 69 N.C. App. 217, 220, 316 S.E.2d 619, 621, *disc. rev. denied*, 312 N.C. 493, 322 S.E.2d 556 (1984) (holding the defendants' reliance unreasonable as a matter of law when the defendants signed a guaranty that expressly contradicted the creditor's assurance).

Recently, in *RL REGI North Carolina, LLC v. Lighthouse Cove, LLC*, we held that a spousal guarantor's execution of a forbearance agreement that "waiv[ed] all defenses" precluded her assertion of a statutory affirmative defense after she was sued for defaulting on the underlying loan. 367 N.C. at 428-30, 762 S.E.2d at 190-91. In reaching this conclusion, we relied on traditional contract interpretation principles. *Id.* at 428-30, 762 S.E.2d at 190-91. The defendant in *RL REGI* executed a guaranty agreement with her bank to support financing for a real estate development project. *Id.* at 426, 762 S.E.2d at 189. The loan went into default, after which the parties entered into a restructuring arrangement; in conjunction with that transaction, the defendant executed an accompanying forbearance agreement. *Id.* at 426, 762 S.E.2d at 189. According to that arrangement, the bank agreed not to exercise its collection remedies under the loan documents and to forego payments on the principal debt during the forbearance period. *Id.* at 426, 762 S.E.2d at 189. In exchange, the defendant "waived 'any and all claims, defenses and causes of action.'" *Id.* at 426, 762 S.E.2d at 189. The plaintiff lender later sued the defendant seeking

recovery of the indebtedness. *Id.* at 427, 762 S.E.2d at 189. In response, the defendant asserted an affirmative defense, arguing that the bank had obtained her guaranty in violation of the federal Equal Credit Opportunity Act. *Id.* at 427, 762 S.E.2d at 189.

Reading the plain language of the forbearance agreement, we held that, regardless of whether the bank had violated the Act, the defendant had waived that defense. *Id.* at 428, 762 S.E.2d at 190 ("We must decide the case, therefore, . . . by what is written in the contract actually made by them." (alteration in original) (quoting *Powers*, 186 N.C. at 338, 119 S.E. at 482)). The defendant acknowledged that she had freely and voluntarily signed the forbearance agreement after having adequate time to review, analyze, and discuss its provisions. *Id.* at 426-27, 762 S.E.2d at 189. Despite the defendant's later assertion to the contrary, we found "nothing facially illegal about this loan relationship," in which the lender agreed to modify a loan upon certain conditions. *Id.* at 429, 762 S.E.2d at 191 ("[P]arties routinely forego claims in settlement agreements."). The defendant's waiver "was not a precondition . . . to receive the . . . loan, but rather it was a negotiated settlement." *Id.* at 430, 762 S.E.2d at 191. The defendant guarantor chose to accept the benefits of the forbearance agreement, which provided leniency in repayment of her debt, and she thus "acknowledged the enforceability of her guaranty and waived a wide array of potential claims [or defenses]." *Id.* at 429, 762 S.E.2d at 190.

Here the language in both the $425,000 Note and accompanying modifications clearly and unambiguously establishes plaintiff's indebtedness. In exchange for incurring the $425,000 Note, plaintiff received benefits, including capital, an additional $99,187.75 in cash proceeds, consolidation of his debts, and reduction of his monthly expenses through interest-only payments. Likewise, plaintiff benefitted from the six loan modification agreements, each of which extended the maturity date of the $425,000 Note and allowed him to make interest-only payments, or via the later modifications, accrue the interest until maturity. The language in the promissory note executed by plaintiff in conjunction with his receipt of the $425,000 states that *"[f]or value received, the undersigned . . . promises to pay."* Plaintiff later reaffirmed that his obligation to repay the debt *"shall remain in full force and effect"* on six different occasions. We accept the Note and modifications as accurate statements of the parties' contractual agreement.

Given that parties are generally free to waive various rights, *RL REGI,* 367 N.C. at 428-29, 762 S.E.2d at 190, plaintiff accepted the terms of the modification agreements, which benefitted him, in exchange for plaintiff's reaffirmation of his loan obligation and waiver of his offsets and defenses against BB&T. With each loan modification plaintiff again consented to the agreement, "waiv[ed] any objection thereto," and "certif[ied] that there are no defenses or offsets against" either the "obligations or the Bank." The text is clear and unambiguous. Plaintiff offers no contrary interpretation of his waiver. If plaintiff relied on verbal assurances contrary

to the documents he signed, such reliance cannot be reasonable, and he was "misled through his own want of reasonable care and circumspection." *Hawkins v. M & J Fin. Corp.*, 238 N.C. 174, 179, 77 S.E.2d 669, 673 (1953); *see RL REGI*, 367 N.C. at 429, 762 S.E.2d at 190. Plaintiff's waiver acknowledging his obligation and waiving any offsets or defenses against the $425,000 Note makes summary judgment proper for BB&T on its counterclaim seeking repayment of the indebtedness.

Each of plaintiff's claims as pled seeks to defeat the $425,000 Note based on plaintiff's bridge loan theory: that he would not have incurred the obligation but for BB&T's assurance that a government-backed loan would be available. By tying each of his claims to the $425,000 Note or to BB&T's refusal to cancel it, plaintiff acknowledges that his claims are efforts to defeat that indebtedness and, therefore, constitute defenses or offsets against that obligation.[8] Construing plaintiff's

---

[8] Plaintiff's stated claims each incorporate by reference his bridge loan theory as outlined in his complaint, and each claim reveals, *inter alia*, the following reliance upon cancellation of the $425,000 Note and accompanying loan agreements:

(1) Plaintiff's negligence claim relies on BB&T's refusal to "cancel the Deed of Trust and Security Agreement" accompanying the $425,000 Note.

(2) Plaintiff's negligent misrepresentation claim provides that BB&T misrepresented that the "[$425,000 Note] would be canceled" and that, "based upon [BB&T's] refusal to cancel the [accompanying] Deed of Trust," plaintiff has been "precluded from selling the property" serving as collateral for the loan.

(3) Plaintiff's breach of contract claim asserts that plaintiff "enter[ed] into the $425,000.00 Promissory Note . . . as the bridge loan for Chair Specialties," and requests that plaintiff "be indemnified on the $425,000.00 note and bridge loan."

(4) Plaintiff's unfair and deceptive trade practices claim relies in part on "representations to induce [plaintiff] to enter into the alleged [$425,000 Note]" and representations that "BB&T would cancel the [$425,000 Note]."

(5) Plaintiff's breach of fiduciary relationship claim relies on "[BB&T's] assurance to

indebtedness as a whole, and in light of established principles of reasonable construction and interpretation, we find the $425,000 indebtedness valid and conclude that plaintiff waived his claims and defenses as they are offsets or defenses to that indebtedness; therefore, summary judgment is proper for BB&T on plaintiff's claims.

Furthermore, plaintiff's claims as pled are logically flawed, and plaintiff fails to establish a genuine issue of material fact regarding his claims. Plaintiff cannot prove, even under his own asserted timeline, that he obtained the $425,000 Note in anticipation of the government-backed loan. In his complaint, plaintiff alleges that on 18 April 2002, he executed the $425,000 Note with BB&T in anticipation of securing a government-backed loan in the future. Plaintiff further alleges that in the weeks that followed, BB&T assured plaintiff that his government-backed loan was "on track" and that it would be approved. Nevertheless, by his own affidavit and interrogatories, plaintiff admits that by January 2002, BB&T had already notified him that no such government-backed loan would be available. Plaintiff further

---

the Plaintiff[ ] that all matters involving the Plaintiff's $425,000.00 note, and any expenses incurred would be resolved," and BB&T's failure to "resolve the issue related to the $425,000.00 loan and damages" and its "refus[al] to cancel the [accompanying] Deed of Trust."

(6) Plaintiff's breach of duty of good faith dealing claim relies on BB&T's actions in "the various respects alleged above," referring to the allegations in the aforementioned claims, all of which rely in large part upon the $425,000 Note.

(7) Plaintiff's fraud claim relies on BB&T's "representations that the [$425,000 Note] and the associated business expenses would be resolved."

admits he had transitioned to closing Chair Specialists and was in the process of selling the associated equipment and other property "by the beginning of 2002." Plaintiff's business partner Barker, by his affidavit, acknowledged the same: "Mr. Mabe contacted me in January of 2002 and stated that . . . the [government-backed loan] had been denied. . . . In early 2002 . . . we were forced to close Chair Specialists." Barker characterized the transaction at issue as a "consolidation loan," stating that "[i]n early 2002, being unable to obtain [the government-backed] loan . . . [plaintiff] thereafter approached BB&T about a single loan of $425,000.00 to consolidate the debt on the building and reduce his monthly expenditures." Even taking the evidence in the light most favorable to plaintiff, BB&T could not have issued the $425,000 Note in anticipation of a future government-backed loan that the bank had already advised plaintiff would not be forthcoming. Plaintiff's blanket assertions cannot overcome his own evidence to the contrary. *See Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 26, 591 S.E.2d 870, 886 (2004) ("[A] party to a suit should not be allowed to change his position with respect to a material matter in the course of litigation." (quoting *Roberts v. Grogan*, 222 N.C. 30, 33, 21 S.E.2d 829, 830-31 (1942))); *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835 (providing that summary judgment is proper when "the opposing party cannot produce evidence to support an *essential element* of her claim" (emphasis added) (citations omitted)). Though a plaintiff may amend his complaint, and leave to do so "shall be freely given when justice so requires," N.C.G.S. § 1A-1, Rule 15(a) (2013), plaintiff failed to do so despite such fundamental, logical defects.

In conclusion, the $425,000 Note and modifications clearly establish plaintiff's indebtedness and his waiver of offsets and defenses against BB&T.  Plaintiff's waiver necessarily included, and extended to, his claims against the $425,000 Note or the bank.  Taking the evidence in the light most favorable to plaintiff, BB&T is entitled to summary judgment in its favor as to all claims set forth in plaintiff's complaint and all but the interest claim stated in BB&T's counterclaim; accordingly, the decision of the Court of Appeals which is before us is reversed.  Regarding the interest claim, the Court of Appeals unanimously held that the trial court erred in calculating the amount of interest due on the $425,000 Note and remanded that issue for determination at trial.  That matter was not before this Court on appeal, and therefore, the decision of the Court of Appeals as to that issue remains undisturbed. Accordingly, this case is remanded to the Court of Appeals for further remand to the Superior Court, Richmond County, for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice ERVIN did not participate in the consideration or decision of this case.