IN THE SUPREME COURT OF NORTH CAROLINA

No. 304A24

Filed 22 May 2026

JOSHUA T. LANGLEY

v.

AUTOCRAFT, INC.

JOSHUA T. LANGLEY

v.

KEITH R. CLAPP

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion entered on 23 July 2024 by Judge Julianna Theall Earp, Special Superior Court Judge for Complex Business Cases, in Superior Court, Guilford County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(a). Heard in the Supreme Court on 15 April 2025.

*Carruthers & Roth, P.A., by Kevin A. Rust, for plaintiff-appellant.*

*Tuggle Duggins P.A., by Denis E. Jacobson, Richard W. Andrews, Jeffrey S. Southerland, and Daniel D. Stratton, for defendant-appellees.*

BARRINGER, Justice.

This Court considers whether the Business Court erred by granting defendants' motion for summary judgment on the basis that consideration for the agreement at issue was illusory. We hold that the provision plaintiff seeks to enforce

is void for indefiniteness. Therefore, we modify and affirm the decision of the Business Court.

## I.   Background

### A. Relevant Facts

Defendant Keith R. Clapp (Clapp) is the founder, sole owner, and sole board member of defendant Autocraft, Inc. (Autocraft) (collectively, defendants). Plaintiff Joshua T. Langley (Langley) is a former Autocraft employee who left Autocraft to work for a different company in January 2015. In 2016, Clapp messaged Langley to inform him that if Langley ever wanted to return to Autocraft, he should give Clapp "a holler." Shortly thereafter, Langley contacted Clapp about the possibility of returning to Autocraft, and discussions between the two ensued.

Prior to rejoining Autocraft, Langley prepared a single-page document and presented it to Clapp for signature in the parking lot of a Hooters restaurant. The document provides in full:

### *Josh Langley's Autocraft Contract*

- $125,000/per year Salary starting on hire date
  - $2403.85/per week
  - Paycheck every other week (Bi-weekly)
  - Salary pay/No punch of time clock/Flexible hours
  - 40-42 hours/per week max
  - Leave work by 5:00 PM daily (subject to Josh's decision)
  - 2% cost of living raise per year giving [sic] on hire date of each year
  - 5% Christmas bonus at end of each year
- 10% ownership of Autocraft Technologies at 5 year

mark from start date
- o Contingent upon Josh's decision to be 10% owner
- o Review books and debt at 4 year mark
- o Owner finance the other 90% over the following 5-10 years
- 3 weeks paid vacation with use of vacation any time of year including winter
- All programming with very little set-up
- Computer Setup
  - o Strong Laptop so I can use at work and home
  - o 24-27 inch dual monitor setup
  - o Logitech performance mx mouse
- MSC to bring in CAPS system to help with keeping tools in stock
  - o I will need MSC login and access to CAPS system to help
- Keep an open understanding about my schooling (College)
- Bobcad schooling in Florida for 3 days (ASAP)
- Mandatory 14-30 day notice upon Josh Langley's leave if necessary
- Josh Langley is guaranteed employment for at least 10 years.

This contract is guaranteed for the next 20 years with Keith Clapp alive or dead and as long as Autocraft Technologies is still a functioning business. All above is guaranteed for the next 20 years with nothing to change except at Josh Langley's discretion from the signed date below.

The signatures of Langley, Clapp, and Clapp's then-wife, all dated 28 December 2016, appear on signature lines at the bottom of the document.[1] The document also includes a signature line for a "Notary Republic [sic]" that was ultimately left blank.

---

[1] Clapp's then-wife separately signed the document on 28 December 2016 while at the Autocraft office.

After this document (the Agreement) was signed, Langley resumed working for Autocraft in January 2017 until his termination in August 2022.

Langley seeks to enforce the provision granting him a 10% ownership interest in the company after five years' employment (10% Ownership Provision). It is undisputed that Langley was, in fact, employed by Autocraft for more than five years. Nevertheless, defendants claim Langley is not entitled to an ownership interest because the Agreement is unenforceable.

## B. Procedural History

On 19 December 2022, Langley filed an action against Autocraft in Superior Court, Guilford County, asserting breach of contract and seeking a declaratory judgment. During depositions in that action, Clapp claimed that he signed the Agreement in his individual capacity and not on behalf of Autocraft. In response, Langley filed a second action against Clapp individually in Superior Court, Randolph County, on 1 February 2024. Both actions were designated mandatory complex business cases under N.C.G.S. § 7A-45.4(a), and later consolidated by order of the Business Court on 14 March 2024.

On 2 April 2024, defendants filed a motion for summary judgment. After full briefing and a hearing on the motion, the Business Court issued an order and opinion (Order) granting defendants' motion. In the Order the Business Court found that the Agreement was illusory. Looking to the final sentence of the Agreement, the Business Court reasoned that "the Agreement confers upon Langley 'an unlimited right to

determine the nature or extent of his performance[,]' rendering the consideration provided by Langley illusory." The Business Court addressed no other issues. Langley directly appealed to this Court pursuant to N.C.G.S. § 7A-27(a)(2).

## II.    Standard of Review

"An appellate court reviews a trial court's decision to grant or deny a motion for summary judgment *de novo*." *SciGrip, Inc. v. Osae*, 373 N.C. 409, 418 (2020) (citation omitted). Under a de novo standard of review, this Court "considers the matter anew and freely substitutes its own judgment" for that of the lower court. *N.C. Farm Bureau Mut. Ins. Co. v. Herring*, 385 N.C. 419, 422 (2023) (quoting *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647 (2003)).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *SciGrip, Inc.*, 373 N.C. at 417–18 (quoting N.C.G.S. § 1A-1, Rule 56(c) (2020)).

## III.    Analysis

On appeal, Langley argues that the Agreement should be enforced because it is not illusory, both by its plain terms and under this Court's holding in *Canteen v. Charlotte Metro Credit Union*, 386 N.C. 18 (2024). Alternatively, Langley argues that

the doctrines of quasi-estoppel and "mend the hold" provide independent bases for enforcing the Agreement.

After careful review, this Court finds that the more appropriate question for resolution of this dispute is whether the Agreement is void for indefiniteness. For the following reasons, we answer that question in the affirmative. Accordingly, we modify and affirm the Business Court's Order.

## A. Void for Indefiniteness

In analyzing the enforceability of a contract, we turn to its text. We construe a contract "as a whole," looking to all the text contained therein. *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 7 (2017) (quoting *Ussery v. Branch Banking & Tr.*, 368 N.C. 325, 335 (2015)). This means that "[e]ach clause and word is considered with reference to each other and is given effect by reasonable construction." *Id.* (quoting *Ussery*, 368 N.C. at 336).

For a contract to be enforceable, "there [must] be 'mutual assent of [the] parties to the terms of the agreement so as to establish a meeting of the minds.' " *Creech v. Melnik*, 347 N.C. 520, 527 (1998) (quoting *Snyder v. Freeman*, 300 N.C. 204, 218 (1980)). When a contract is "so vague and indefinite that it is not possible to collect from it the full intent of the parties," then there was no true meeting of the minds, and the contract "is void." *Holder v. Home Mortg. Co.*, 214 N.C. 128, 133 (1938) (extraneity omitted). This rule is well-founded as, certainly, a court cannot enforce a contract whose meaning it cannot decipher. *See Boyce v. McMahan*, 285 N.C. 730, 734

(1974).

In the instant case, Langley seeks to enforce the 10% Ownership Provision of the Agreement that states "10% ownership of Autocraft Technologies at 5 year mark from start date." Yet immediately indented below this text are three additional sub-provisions, which read:

- o Contingent upon Josh's decision to be 10% owner
- o Review books and debt at 4 year mark
- o Owner finance the other 90% over the following 5-10 years

These three sub-provisions are "common" to and "interdependent" upon the 10% Ownership Provision that Langley seeks to enforce. *Wooten v. Walters*, 110 N.C. 251, 254 (1892). Thus, no single sub-provision is severable from the rest of the 10% Ownership Provision.

Moreover, the other terms of the Agreement confirm as much. Indeed, when we are interpreting contracts, we must "construe them as a whole." *Ussery*, 368 N.C. at 335. Take, for example, the provision regarding computer setup (Computer Setup Provision). Like the 10% Ownership Provision, the Computer Setup Provision is followed by three sub-provisions. Its three sub-provisions state:

- o Strong Laptop so I can use at work and home
- o 24-27 inch dual monitor setup
- o Logitech performance mx mouse

These sub-provisions detail the full extent of the "[c]omputer [s]etup" to which Langley sought to be entitled. Specifically, Langley sought to ensure that his computer would be a "[s]trong" laptop that he could use at work and home along with

a dual monitor and a Logitech mouse. In short, the details of the Computer Setup Provision are fully described in its sub-provisions. It is apparent that Langley would not simply accept any old "[c]omputer [s]etup" under the Agreement. Rather, the computer setup had to meet the requirements outlined in its sub-provisions.

The same is true for the 10% Ownership Provision. Its sub-provisions ensured that Langley would be the one to decide to become a 10% owner, that he would have the opportunity to review the books and debt after 4 years of employment, and that "[o]wner finance" of "the other 90%" would take place over the course of the next 5 to 10 years. Moreover, the consideration for the 10% Ownership Provision and its sub-provisions is the same: Langley's continued employment under the Agreement. Therefore, the 10% Ownership Provision is "not severable" from its sub-provision parts. *Wooten*, 110 N.C. at 254 ("A contract is entire, and not severable, when by its terms, nature and purpose it contemplates and intends that each and all of its parts, material provisions, and the consideration, are common each to the other and interdependent.").

As a result, the 10% Ownership Provision is only enforceable if this Court can determine its meaning; however, that we cannot do. In particular, the third sub-provision, which states in full, "[o]wner finance the other 90% over the following 5-10 years[,]" is devoid of terms necessary for enforcement. The sub-provision specifies no price or formula upon which price could be computed. It provides no details for precisely how "the other 90%" would be owner-financed over the following

5 to 10 years. It gives no timeline for which payments would be made. Thus, enforcement of the 10% Ownership Provision would place this Court in an untenable position—compelling the parties to proceed on terms to which they never assented.[2] *See Holder*, 214 N.C. at 133 ("[N]either the court nor the jury can make an agreement for the parties." (extraneity omitted)). We therefore must hold that the indefiniteness of the Agreement is fatal to its enforcement.

## B. Equitable Defenses

In the alternative, Langley sought to defend against defendants' summary judgment motion by invoking the doctrines of quasi-estoppel and mend the hold. Curiously, the Business Court never addressed these equitable defenses. Yet, because these defenses require no further factual development and were adequately argued on appeal, we elect to address them here.

"Under a quasi-estoppel theory, a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction or instrument." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 18 (2004) (citations omitted). The doctrine is premised on the well-settled principle that "a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time

---

[2] When Langley was asked what price he would pay for "the other 90 percent," he admitted that "[p]rice was never brought up." This is a problem. North Carolina courts have repeatedly recognized that price or a means to calculate price is a material term to a contract. *See, e.g.*, *Connor v. Harless*, 176 N.C. App. 402, 405 (2006), *disc. rev. denied*, 361 N.C. 219 (2007); *Howell v. C. M. Allen & Co.*, 8 N.C. App. 287, 289 (1970).

deny the effect of other terms of the same agreement." *Brooks v. Hackney*, 329 N.C. 166, 173 (1991) (quoting *Cap. Outdoor Advert., Inc. v. Harper*, 7 N.C. App. 501, 505 (1970)).

Langley's quasi-estoppel theory of recovery runs into the same problem as that described above. As a matter of first principles, a party cannot seek to enforce a contract's term—by quasi-estoppel theory or otherwise—that is indefinite. *Cf. Brooks*, 329 N.C. at 168, 173 (enforcing, from an otherwise unenforceable land-sale agreement, a sales provision that specified the total price, interest rate, and periods of payment); *Cap. Outdoor Advert., Inc.*, 7 N.C. App. at 504–05 (enforcing, from an otherwise unenforceable lease agreement, lease provisions that specified the lease period and monthly rental cost). Stated differently, while a provision from an otherwise unenforceable contract may be enforced under quasi-estoppel, such enforcement is not possible if the provision's terms are so indefinite that the court cannot fashion the remedy. *See Elliott v. Duke Univ.*, 66 N.C. App. 590, 595 ("Where one party simply believes that a contract exists, but there is no meeting of the minds, the individual seeking to enforce the obligation upon a contract theory is without a remedy." (citing *Brown v. Williams*, 196 N.C. 247 (1928))), *disc. rev. denied*, 311 N.C. 754 (1984).

Such is the case here. As explained above, the 10% Ownership Provision that Langley seeks to enforce lacks material terms capable of a remedy. The provision is completely devoid of necessary terms for enforcement. Accordingly, a quasi-estoppel

theory of recovery is of no avail to Langley. There was no meeting of minds as to the purported obligation.

The doctrine of mend the hold is "an equitable doctrine that precludes the assertion of inconsistent litigation positions, usually concerning the meaning of a contract, within the context of a single lawsuit." *Whitacre*, 358 N.C. at 24. The doctrine "limits a nonperforming party's potential defenses for breaking a contract to those based on the prelitigation explanation for nonperformance that was given to the other party." Robert H. Sitkoff, Comment, *"Mend the Hold" and* Erie*: Why an Obscure Contracts Doctrine Should Control in Federal Diversity Cases*, 65 U. Chi. L. Rev. 1059, 1064 (1998), *cited in Whitacre*, 358 N.C. at 24.

To illustrate its application, the doctrine was first invoked in a case in which a defendant railroad refused to perform on a delivery contract, explaining that it lacked enough cars to make the delivery. *Ry. Co. v. McCarthy*, 96 U.S. 258, 265 (1877). After litigation began, the railroad company then tried to defend its nonperformance, which had occurred on a Sunday, under a West Virginia law forbidding Sunday deliveries. *Id.* at 267. The Supreme Court of the United States explained that "[w]here a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold." *Id.* at 267–68.

Langley points to Autocraft's counterclaim as the source of inconsistent

litigation positions. That counterclaim alleged that Langley owed a fiduciary duty to Autocraft. Langley's logic is that if Autocraft had previously argued that Langley owed a fiduciary duty, then Autocraft must have implicitly taken the position that the Agreement was enforceable such that Langley possessed an ownership interest.

For starters, this argument asks the Court to infer a position never explicitly taken by defendants. In fact, Autocraft explicitly rejected such a position at the hearing on this counterclaim. There, Autocraft maintained: "[*W*]*e don't think this contract is in any way enforceable*, but the basis for our counterclaim is their allegations, based on this contract, what it means, and what rights and duties it provided to Mr. Langley." (Emphasis added.) Accordingly, it is not clear to this Court that defendants ever took an inconsistent position.

Even still, Langley's argument misapprehends the doctrine of mend the hold. Autocraft's counterclaim is a wholly separate claim stated in the alternative; it is not a new justification for nonperformance under the Agreement. Parties are permitted to argue in the alternative. To be sure, "[t]here is no requirement that all claims be legally consistent." *Concrete Serv. Corp. v. Invs. Grp., Inc.*, 79 N.C. App. 678, 684 (citing N.C. R. Civ. P. 8(e)(2)), *cert. denied*, 317 N.C. 333 (1986). Consequently, a mend the hold theory of recovery fails on the merits as well.

Finally, it is worth acknowledging that the dissent would remand this matter to the Business Court to evaluate an unjust enrichment claim. However, Langley did not plead unjust enrichment in the complaint; did not raise the claim in the summary

judgment briefing; and did not argue the claim in his briefing to this Court. Indeed, in the 1,000 pages of pleadings, motions, and briefing in the trial record, the phrase "unjust enrichment" does not appear even a single time. If we were to take the dissent's approach, we would certainly be charting new territory, as courts are not in the business of making arguments for parties that they did not make themselves. *See In re E.H.*, 388 N.C. 100, 101–02 (2025); *see also State ex rel. Jackson v. E.I. du Pont de Nemours & Co.*, 926 S.E.2d 402, 405 n.1 (N.C. 2026) (Earls, J., dissenting) (criticizing a concurrence for purportedly "making arguments for defendants that they did not make themselves"). For this reason, we disagree that remanding for a claim never raised is appropriate.

## IV.    Conclusion

A thoughtful review reveals that the more appropriate question for resolution of this dispute is whether the Agreement is void for indefiniteness. We answer that question in the affirmative. The provision that Langley seeks to enforce is not severable from its sub-provisions which detail the full extent of the ownership rights and obligations. In addition, those rights and obligations fail to include material terms that this Court may enforce. As such, the Agreement is void for indefiniteness. We therefore modify and affirm the Business Court's Order.

MODIFIED AND AFFIRMED.

Justice EARLS dissenting.

The Restatement of Restitution and Unjust Enrichment provides that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement (Third) of Restitution and Unjust Enrichment § 1 (A.L.I. 2011). To succeed on an unjust enrichment claim, the plaintiff must show that a benefit was conferred upon the defendant. That benefit cannot have been officious—meaning it must not have arisen from an unjustified intrusion into the other party's affairs—nor can it have been given as a gift. The benefit must also be capable of quantification. *Booe v. Shadrick*, 322 N.C. 567, 570 (1988). Where these elements are satisfied, the defendant is obligated to return the benefit itself, its traceable proceeds, or a monetary equivalent. *See* Restatement (Third) of Restitution § 1.

Mr. Langley and Mr. Clapp entered into an employment agreement under which Mr. Langley would provide services to Autocraft in exchange for, among other things, the opportunity to acquire a 10% ownership interest after five years. That ownership provision was contingent on Mr. Langley's election — following a review of Autocraft's books and debts after four years of service — to exercise his option. The agreement further contemplated that Mr. Clapp would owner-finance the remaining 90% of Autocraft to Mr. Langley over the subsequent five to ten years. Mr. Langley fulfilled his end: he remained employed at Autocraft for more than five years and,

during that tenure, served as a critical revenue-generating employee upon whom the company depended. Mr. Clapp, for his part, expressed intent to either convey or facilitate Mr. Langley's purchase of the 10% interest.

On these facts, the unjust enrichment elements are readily apparent. Mr. Langley conferred a measurable benefit on Mr. Clapp through years of valuable service. Mr. Clapp consciously accepted those services. They were rendered neither as a gratuity nor as an unjustified intrusion into Mr. Clapp's affairs, but pursuant to a bargained-for arrangement. And the value of that benefit is capable of quantification — the price of a business interest is precisely the kind of ascertainable figure the Business Court is equipped to assess.

Rightfully, I would remand to the Business Court to evaluate the unjust enrichment claim, consistent with the principle that "[w]here there is no express contract to pay, the law implies a promise to pay fair compensation for services rendered unless rendered as a gratuity or in discharge of some obligation." *See Cline v. Cline*, 258 N.C. 295, 298 (1962). I respectfully dissent.

Justice RIGGS joins in this dissenting opinion.