IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-89

No. COA21-138

Filed 15 February 2022

Forsyth County, No. 18 CVS 5491

KIMBERLY D. BRYANT, Plaintiff,

v.

WAKE FOREST UNIVERSITY BAPTIST MEDICAL CENTER, NORTH CAROLINA BAPTIST HOSPITAL, WAKE FOREST UNIVERSITY HEALTH SCIENCES, & MEHMET TAMER YALCINKAYA, M.D., Defendants.

Appeal by Plaintiff from order granting Defendants' motion for summary judgment entered 23 October 2020 by Judge Eric C. Morgan in Forsyth County Superior Court. Heard in the Court of Appeals 16 November 2021.

*Kennedy, Kennedy, Kennedy, & Kennedy, LLP, by Harvey L. Kennedy and Harold L. Kennedy, III, for Plaintiff-Appellant.*

*Coffey Law PLLC, by Tamura D. Coffey, Elizabeth G. Horton, and Peyton M. Pawlik, for Defendant-Appellee Mehmet Tamer Yalcinkaya, M.D.*

*Shumaker, Loop & Kendrick, LLP, by Scott M. Stevenson, John D. Kocher, and Christopher T. Hood, for Defendant-Appellees Wake Forest University Baptist Medical Center, North Carolina Baptist Hospital, and Wake Forest University Health Sciences.*

JACKSON, Judge.

¶ 1        Kimberly D. Bryant ("Plaintiff") appeals from an order granting Mehmet Tamer Yalcinkaya, M.D., Wake Forest University Baptist Medical Center, North

Carolina Baptist Hospital, and Wake Forest University Health Sciences' (collectively "Defendants") motion for summary judgment. Plaintiff argues that the trial court erred because a genuine issue of material fact existed for her fraudulent concealment, res ipsa loquitor, medical malpractice, and punitive damages claims. We affirm the trial court's grant of summary judgment for each of Plaintiff's claims.

## I.    Background

¶ 2    In 2007, Plaintiff was referred to Mehmet Tamer Yalcinkaya, M.D. ("Defendant Yalcinkaya"), a reproductive endocrinologist, due to pelvic pain caused by a large uterine myoma, also known as a uterine fibroid. At that time, Defendant Yalcinkaya was an attending physician, associate professor, and the Reproductive Endocrinology and Infertility ("REI") Section Head at Wake Forest University Baptist Medical Center in Winston-Salem. Defendant Yalcinkaya was a physician licensed in North Carolina and board-certified in both Obstetrics and Gynecology ("OB-GYN") and REI.

¶ 3    After examining Plaintiff, Defendant Yalcinkaya confirmed her uterine myoma diagnosis and recommended an exploratory laparotomy (abdominal surgery) and myomectomy (surgical removal of uterine fibroids). After Plaintiff consented to the surgical course of treatment, Defendant Yalcinkaya performed the surgery on 5 October 2007. During the procedure, Defendant Yalcinkaya determined that Plaintiff

had Stage IV endometriosis, an advanced form of a disorder that results in abnormal endometrial tissue growth outside the uterus, which had affected Plaintiff's uterus, fallopian tubes, ovaries, and uterine cul-de-sac—meaning that Plaintiff's pelvis was largely covered with adhesions and scar tissue. Defendant Yalcinkaya removed Plaintiff's large uterine fibroid and many of the endometrial adhesions. After the surgery, Defendant Yalcinkaya documented and diagrammed the extent of Plaintiff's endometriosis, and noted in her chart that her prognosis regarding fertility was guarded even with removal of the fibroid and the assistance of in vitro fertilization ("IVF"). Plaintiff alleged that Defendant Yalcinkaya told her and her husband after the surgery "to rest for three months, and after that there was no reason she couldn't get pregnant and have a child."

¶ 4        Near the end of the surgery, Defendant Yalcinkaya implanted a prelude peritoneal membrane, also known as a Gore-Tex adhesion barrier, to prevent adhesions from forming at the surgical incision site where the fibroid was removed. Defendant Yalcinkaya used non-absorbable sutures when implanting the Gore-Tex barrier, in order to keep it in place permanently. The use of the Gore-Tex barrier was documented in Defendant Yalcinkaya's operative note for the procedure, as well as in the perioperative record of the procedure. The Gore-Tex barrier was specifically listed under the "Implants" section of the operative note, with the serial number, lot number, and model number of the barrier listed along with other information. This

type of surgical membrane was routinely used in 2007 to prevent pelvic adhesion formation. Defendant Yalcinkaya testified that he used the implant to prevent adhesion formation at the incision site and increase Plaintiff's fertility and chance of carrying a child to term.

¶ 5 After the procedure, Plaintiff saw Defendant Yalcinkaya for post-operative treatment. Defendant Yalcinkaya recommended and noted in her chart that Plaintiff undergo drug therapy to inhibit uterine fibroid growth as well as a second procedure to evaluate her endometriosis and remove additional fibroids and endometrial adhesions. Defendant Yalcinkaya says he told Plaintiff this during an office visit on 9 October 2007 and another visit on 18 December 2007, but Plaintiff asserts this was never communicated to her. Plaintiff did not complete drug therapy or undergo a second surgery, and her last office visit with Defendant Yalcinkaya was 5 March 2008. At this last appointment, Plaintiff indicated that she did not know when she might want to become pregnant and discontinued her treatment with Defendant Yalcinkaya.

¶ 6 In December 2016, Plaintiff returned to the Wake Forest gynecology clinic for treatment of a large pelvic mass. On 21 February 2017, Plaintiff presented for surgery to E. Johnston-MacAnanny, M.D. ("Dr. Johnston"), who performed an exploratory laparotomy with adhesiolysis, evaluating and draining Plaintiff's pelvic mass. During this procedure, Dr. Johnston found and removed the Gore-Tex implant

that had been placed by Defendant Yalcinkaya almost ten years prior. At the time, Dr. Johnston did not know what the object was, and initially thought it could be a sheet of plastic. After lab analysis, it was later discovered to be the Gore-Tex implant.

¶ 7        On 21 September 2017, Plaintiff filed suit against Wake Forest University Baptist Medical Center, North Carolina Baptist Hospital, Wake Forest University Health Sciences, and Defendant Yalcinkaya (collectively "Defendants") alleging that the Gore-Tex barrier implanted by Defendant Yalcinkaya caused her infertility. On 16 February 2018, Plaintiff voluntarily dismissed the suit without prejudice, and filed a new complaint on 25 October 2018, naming the same defendants.

¶ 8        On 12 March 2020, Plaintiff's standard of care expert, Steven D. McCarus, M.D. ("Dr. McCarus"), was deposed. During his deposition, Dr. McCarus testified in relevant part that

- In 2007, there were three types of FDA-approved implants to prevent post-surgical adhesion formation, one of which was the Gore-Tex barrier used in this case.

- Adhesion barriers have a therapeutic purpose, and in 2006 and 2007, Gore-Tex adhesion barriers had therapeutic purposes.

- At the time of Plaintiff's procedure, there was no medical literature suggesting that any of the adhesion barriers were superior; it was simply the surgeon's preference as to which FDA-approved implant to use.

- If Plaintiff chose not to return to Defendant Yalcinkaya for treatment, Defendant Yalcinkaya had no ability to further treat Plaintiff or continue her course of care.

On 11 April 2020, Plaintiff served an errata sheet that attempted to modify and change some of Dr. McCarus's testimony. In particular, in the errata sheet, Dr. McCarus testified that

- Gore-Tex barriers "can" have a therapeutic purpose "if they are properly used. In the case of Kimberly Bryant, the Gore-Tex adhesion barriers were improperly used because Dr. Yalcinkaya failed to remove them within 2 to 8 weeks after the gynelogic surgery."

- Gore-Tex barriers "could have therapeutic purposes if they were properly used. . . . Per his deposition testimony, [Dr. Yalcinkaya's] intent was to leave the Gore-Tex in Ms. Bryant's body permanently. To leave this in her body more than 8 weeks after surgery would have been for a non-therapeutic purpose."

Defendants moved for summary judgment on the grounds that the pleadings, written discovery, depositions, and affidavits showed no genuine issue of material fact on her fraud, medical malpractice, or res ipsa loquitor claims. Plaintiff opposed the motion and filed another affidavit from Dr. McCarus in response. The affidavit reflected the modifications made in the errata sheet. On 23 October 2020, the trial court entered an order granting Defendants' motion for summary judgment and

dismissing Plaintiff's claims with prejudice.

Plaintiff timely filed notice of appeal.

## II.    Analysis

### A.  Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1(c), Rule 56 (2021). "All facts asserted by the nonmoving party are taken as true and viewed in the light most favorable to that party." *Ussery v. Branch Banking & Trust Co.*, 368 N.C. 325, 334, 777 S.E.2d 272, 278 (2015) (internal marks and citation omitted). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *Ussery*, 368 N.C. at 335, 777 S.E.2d at 278-79 (internal quotation and citation omitted). On appeal, we review an order granting summary judgment *de novo*. *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014).

### B. Fraudulent Concealment: Fraud and Breach of Fiduciary Duty

In support of her claim of fraudulent concealment, Plaintiff makes arguments of actual fraud and constructive fraud. We hold that the evidence fails to support a

prima facie case of either actual or constructive fraud, and therefore affirm the trial court's grant of summary judgment dismissing the fraudulent concealment claim.

### 1. *Actual Fraud*

¶ 14 Plaintiff advances three theories of fraudulent concealment:[1] (1) Defendant Yalcinkaya concealed the fact that he placed the Gore-Tex barrier inside of Plaintiff, (2) Defendant Yalcinkaya concealed that the Gore-Tex barrier needed to be removed after eight weeks, and (3) Defendant Yalcinkaya concealed that Plaintiff needed a second operation and additional drug therapy. We agree with the trial court that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on Plaintiff's fraudulent concealment claim.

¶ 15 In order to support a claim of actual fraud, Plaintiff must prove five elements: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Watts v. Cumberland Cnty. Hosp. Sys. Inc.*, 317 N.C. 110, 117, 343 S.E.2d 879, 884 (1986) (internal quotation and citation omitted).

¶ 16 Here, Plaintiff fails to make a prima facie case of actual fraud. First, Plaintiff's

---

[1] Additionally, Plaintiff argues for the first time on appeal that Defendant Yalcinkaya made an intentionally false statement to Plaintiff by telling her "to rest for three months, and after that there was no reason she couldn't get pregnant and have a child." However, Plaintiff cannot create an issue of material fact for summary judgment by raising it for the first time on appeal, *see Piraino Bros., LLC v. Atl. Fin. Grp., Inc.,* 211 N.C. App. 343, 348, 712 S.E.2d 328, 332 (2011), and therefore we decline to address this argument that was not before the trial court.

evidence does not support her argument that Defendant Yalcinkaya concealed the implantation of the Gore-Tex barrier. Plaintiff claims that Defendant Yalcinkaya did not inform her about the Gore-Tex barrier's implantation in any of her appointments, and Defendant Yalcinkaya claims that he discussed the implantation both before and after Plaintiff's surgery. Defendant Yalcinkaya's operative note reflects that, during Plaintiff's procedure, he placed a Gore-Tex barrier over a uterine incision and sutured said barrier to her "uterine serosa." Moreover, Defendant Yalcinkaya's post-operative record provides the exact serial, lot, and model number of the Gore-Tex barrier that was implanted during Plaintiff's surgery.

¶ 17       Second, Plaintiff's evidence does not support her argument that Defendant Yalcinkaya concealed that the Gore-Tex barrier needed to be removed after eight weeks. Although Plaintiff presented expert testimony that the Gore-Tex barrier needed to be removed after eight weeks, she did not present any evidence tending to show that it was Defendant Yalcinkaya's intention to remove the Gore-Tex barrier after eight weeks, or that he falsely represented or concealed this from Plaintiff with the intent to deceive her. In his sworn testimony, Defendant Yalcinkaya never wavered that he implanted the Gore-Tex barrier in Plaintiff with the intention that it remain in her body permanently.

¶ 18       Third, Plaintiff's evidence does not support her argument that Defendant Yalcinkaya intentionally concealed that Plaintiff needed a second operation and

additional drug therapy. Plaintiff claims that Defendant Yalcinkaya never informed her about additional treatments, and in fact, told her "to rest for three months, and after that there was no reason she couldn't get pregnant and have a child." However, Defendant Yalcinkaya specifically noted in Plaintiff's chart that her fertility prognosis was guarded even with the assistance of IVF. Assuming that Defendant Yalcinkaya's statement was a false representation or concealment of a material fact, Plaintiff still has not produced any evidence that the statement was reasonably calculated to deceive or that Defendant Yalcinkaya made the statement with intent to deceive. Plaintiff alleges that Defendant Yalcinkaya "decided not to provide her further medical treatment because he believed she could not pay him[,]" and this suffices to show Defendant Yalcinkaya's motive and intent to deceive. However, after the completion of her surgery, Plaintiff voluntarily discontinued treatment with Defendant Yalcinkaya. Plaintiff's own expert acknowledged that her decision not to return for treatment thereafter precluded Defendant Yalcinkaya from continuing Plaintiff's postoperative care or engaging in further treatments.

### 2. *Breach of Fiduciary Duty and Constructive Fraud*

¶ 19        A claim for breach of fiduciary duty is ordinarily subject to a three-year statute of limitations but may be governed by a 10-year statute of limitations when it "rise[s] to the level of constructive fraud." *Ironman Med. Props., LLC v. Chodri*, 268 N.C. App. 502, 512, 836 S.E.2d 682, 690 (2019) (internal quotation and citations omitted).

Here, because Plaintiff's suit was not filed until over nine years after Defendant Yalcinkaya's last act, Plaintiff's claim for breach of fiduciary duty is necessarily barred unless it rises to the level of constructive fraud.

In order to prove constructive fraud, Plaintiff must allege and prove: "(1) that the defendant owes the plaintiff a fiduciary duty; (2) that the defendant breached that duty; and (3) that the defendant sought to benefit himself in the transaction." *Ironman*, 268 N.C. App. at 513, 836 S.E.2d at 691 (internal marks and citation omitted). This Court has further emphasized that

> [t]he primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the intent and showing that the defendant benefitted from his breach of duty. This element requires a plaintiff to allege and prove that the defendant took advantage of his position of trust to the hurt of plaintiff and sought his own advantage in the transaction.

*Id.* (internal quotations and citations omitted).

Here, Plaintiff asserts that *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 812 S.E.2d 831 (2018), eliminated the requirement of a benefit to prove constructive fraud. In *Head*, our Supreme Court states the following on constructive fraud:

> Constructive fraud arises where a confidential or fiduciary relationship exists, and its proof is less exacting than that required for actual fraud. When a fiduciary relation exists between parties to a transaction, equity raises a presumption of fraud when the superior party obtains a possible benefit. To assert a cause of action for constructive fraud, the plaintiff must allege facts and circumstances (1)

> which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.

*Head,* 371 N.C. at 9, 812 S.E.2d at 837 (internal marks and citations omitted). At no point in *Head* does our Supreme Court expressly or impliedly eliminate the benefit requirement as Plaintiff contends. Moreover, after *Head*, this Court has continued to require a showing of benefit for constructive fraud. *See, e.g., Ironman Med. Props.*, 268 N.C. App. at 513, 836 S.E.2d at 691; *Stitz v. Smith,* 272 N.C. App 415, 422, 846 S.E.2d 771, 775 (2020); *Gen. Fid. Ins. Co. v. WFT, Inc.,* 269 N.C. App. 181, 186, 837 S.E.2d 551, 556 (2020).

¶ 22 Here, Plaintiff's only argument that Defendant Yalcinkaya benefitted from his alleged breach of duty is that Plaintiff "allowed Dr. Yalcinkaya to perform the surgery on her." However, in *Ironman*, we held that the benefit alleged by a plaintiff must be "more than a continued relationship with the plaintiff[,]" 268 N.C. App. at 513, 836 S.E.2d at 691, and, further, Defendant Yalcinkaya testified that there were no factors about Plaintiff's case or procedure that would enhance his reputation or give him any possible benefit.

¶ 23 Because Plaintiff has failed to create a prima facie case of fraudulent concealment, either through actual or constructive fraud, the trial court properly concluded that Defendants are entitled to summary judgment as a matter of law.

**C. Res Ipsa Loquitor**

Plaintiff argues that the trial court erred by concluding that res ipsa loquitor was inapplicable in this case. We disagree and affirm the trial court's conclusion on res ipsa loquitor.

"*Res ipsa loquitur* applies when (1) direct proof of the cause of an injury is unavailable, (2) defendant controlled the instrumentality involved in the accident, and (3) the injury is of a type that does not ordinarily occur in the absence of some negligent act or omission." *Bluitt v. Wake Forest Univ. Baptist Med. Ctr.*, 259 N.C. App. 1, 4, 814 S.E.2d 477, 480 (2018) (internal quotation and citation omitted). "For the doctrine to apply in a medical malpractice claim, a plaintiff must allege facts from which a layperson could infer negligence by the defendant based on common knowledge and ordinary human experience." *Smith v. Axelbank*, 222 N.C. App. 555, 559, 730 S.E.2d 840, 843 (2012). Therefore, "*res ipsa loquitur* is inappropriate in the usual medical malpractice case, where the question of injury and the facts in evidence are peculiarly in the province of expert opinion." *Bluitt,* 259 N.C. App. at 5, 814 S.E.2d at 480 (internal quotation and citation omitted). *See also Rowell v. Bowling*, 197 N.C. App. 691, 696, 678 S.E.2d 748, 751 (2009) ("Normally, in [medical malpractice] actions, both the standard of care and its breach must be established by expert testimony." (internal quotation omitted)).

Here, the trial court, in holding that res ipsa loquitor was inapplicable, found

that

> [q]uestions of if and when the Gore-Tex should have been removed and what damage a failure to remove caused to Plaintiff are questions that a layperson could not resolve with ordinary knowledge and experience. Indeed, both parties have qualified expert[] witnesses precisely because such testimony is necessary to answer those questions.

We agree with the trial court that res ipsa loquitor cannot apply because a layperson, without the assistance of expert testimony, could not infer negligence from the facts of this case based on common knowledge and ordinary human experience. Plaintiff's procedure involved the surgical placement of a Gore-Tex adhesion barrier, the proper use of which is outside the common knowledge, experience, and sense of a layperson. Thus, without expert testimony, a layperson would lack a basis to determine whether Plaintiff's injury was one that would not normally occur in the absence of negligence or was an inherent risk of the procedure and use of this surgical bandage. Therefore, because "both the standard of care and its breach must be established by expert testimony[,]" *Bluitt*, 259 N.C. App. at 6, 814 S.E.2d at 481, we agree that a res ipsa loquitor claim is inappropriate in this case and affirm the trial court's conclusion that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on Plaintiff's res ipsa loquitor claim.

**D. Medical Malpractice**

Plaintiff argues that there is a genuine issue of material fact regarding

whether the Gore-Tex barrier had a therapeutic purpose or effect at the time it was implanted. We disagree and affirm the trial court's grant of summary judgment.

¶ 29    North Carolina General Statutes § 1-15(c) provides three different time limitations for medical malpractice claims:

> [1] a minimum three-year period from occurrence of the last act;
>
> [2] an additional one-year-from-discovery period for injuries "not readily apparent" subject to a four-year period of repose commencing with defendant's last act giving rise to the cause of action; and
>
> [3] an additional one-year-from-discovery period for foreign objects subject to a ten-year period of repose again commencing with the last act of defendant giving rise to the cause of action.

*Black v. Littlejohn*, 312 N.C. 626, 634, 325 S.E.2d 469, 475 (1985). Regarding the third option, the statute specifically provides that

> where damages are sought by reason of a foreign object, which has *no therapeutic or diagnostic purpose or effect*, having been left in the body, a person seeking damages for malpractice may commence an action therefor within one year after discovery thereof as hereinabove provided, but in no event may the action be commenced more than 10 years from the last act of the defendant giving rise to the cause of action.

N.C. Gen. Stat. § 1-15(c) (2021) (emphasis added).

¶ 30    Here, the crux of the issue is whether the Gore-Tex barrier had a therapeutic purpose or effect, such that it is not considered a "foreign object" which would require

application of the 10-year statute of limitations. The trial court found that the four-year statute of limitations applied, but Plaintiffs argue that we should apply the 10-year statute of limitations because the Gore-Tex barrier is a nontherapeutic foreign object. The trial court, however, found that "Plaintiff's and Defendants' experts agree that Gore-Tex can be properly used as an adhesion barrier to prevent pelvic adhesion formation and that such a use is therapeutic."

¶ 31        Plaintiff argues that actually, their experts did not agree that the Gore-Tex barrier serves a therapeutic purpose, pointing to her expert's errata sheet and affidavit. Defendants argue at length that this Court should not consider Plaintiff's expert's errata sheet or affidavit, which they argue impermissibly modify Dr. McCarus's deposition testimony and attempt to create an issue of fact under the sham affidavit doctrine.[2] In his deposition testimony, Dr. McCarus testified unequivocally that adhesion barriers, and specifically the Gore-Tex barrier, have a therapeutic purpose. In the disputed errata sheet, Dr. McCarus slightly modifies this testimony to say that Gore-Tex adhesion barriers "*can* [have a therapeutic purpose] if they are properly used" and "*could* have therapeutic purposes if properly used." In the errata

---

[2] The sham affidavit doctrine provides that conflicts between an expert's deposition and later affidavits create a credibility issue, not a genuine issue of material fact, and therefore it would be improper to consider the conflicting testimony when making a summary judgment determination. *Hawkins v. Emergency Med. Physicians of Craven Cnty., PLLC*, 240 N.C. App. 337, 345, 770 S.E.2d 159, 164-65 (2015).

sheet, Dr. McCarus then opines that the Gore-Tex barrier was improperly used in this case because Defendant Yalcinkaya failed to remove it after two to eight weeks, and clarifies that the Gore-Tex barrier could not have a therapeutic purpose here because Defendant Yalcinkaya intended to leave the Gore-Tex barrier in Plaintiff's body permanently, which would be non-therapeutic.

¶ 32     We disagree with Plaintiff and hold that the trial court correctly found no issue of material fact as to whether the Gore-Tex barrier had a therapeutic purpose. Without reaching the sham affidavit doctrine issue introduced by Defendants, even if the errata sheet is admissible testimony, Plaintiff has improperly interpreted statutory language in an attempt to create an issue of fact.

¶ 33     When engaging in statutory interpretation, our Supreme Court has explained

> [t]he primary rule of statutory construction is that the intent of the legislature controls the interpretation of a statute. The foremost task in statutory interpretation is to determine legislative intent while giving the language of the statute its natural and ordinary meaning unless the context requires otherwise. Where the statutory language is clear and unambiguous, the Court does not engage in judicial construction but must apply the statute to give effect to the plain and definite meaning of the language.

*Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 518, 597 S.E.2d 717, 722 (2004) (internal marks and citations omitted). Moreover, "a statute should not be interpreted in a manner which would render any of its words superfluous. We construe each word of a statute to have meaning, where reasonable and consistent

with the entire statute, because it is always presumed that the legislature acted with care and deliberation." *State v. Coffey*, 336 N.C. 412, 417-18, 444 S.E.2d 431, 434 (1994) (internal marks and citations omitted).

¶ 34      In giving words their natural and ordinary meaning, this Court has interpreted clauses connected by the "disjunctive 'or'" to mean that

> application of the statute is not limited to cases falling within both clauses but applies to cases falling within either one of them. In its elementary sense the word 'or', as used in a statute, is a disjunctive particle indicating that the various members of the sentence are to be taken separately[.]

*Grassy Creek Neighborhood All., Inc. v. City of Winston-Salem*, 142 N.C. App. 290, 297, 542 S.E.2d 296, 301 (2001) (internal marks and citations omitted).

¶ 35      Here, the crux of the statutory language in question focuses on the phrase "a foreign object, which has no *therapeutic or diagnostic purpose or effect*, having been left in the body[.]" N.C. Gen. Stat. § 1-15(c) (2021) (emphasis added). There is no case law from North Carolina courts discussing or interpreting the meaning of therapeutic purpose or effect under this statute, and therefore this is an issue of first impression. We hold that the statute's natural and ordinary meaning indicates that an object can have *either* a therapeutic purpose *or* therapeutic effect to be removed from the outer 10-year statute of limitations.

¶ 36      Here, Plaintiff argues that an issue of material fact exists because her expert,

Dr. McCarus, claims the Gore-Tex barrier does not have a therapeutic purpose and Defendants' expert claims the Gore-Tex barrier does have a therapeutic purpose. However, this is an oversimplification and mischaracterization of Dr. McCarus's testimony. Even accepting Dr. McCarus's modified testimony that the Gore-Tex "can" or "could" have a therapeutic purpose if left in the body for only two to eight weeks, Plaintiff's expert admits that Gore-Tex barriers serve a therapeutic purpose when properly used —he just disputes Defendant Yalcinkaya's decision to leave the barrier in Plaintiff's body permanently. Assuming that the Gore-Tex barrier should have been removed eight weeks after implantation, the barrier still had a therapeutic purpose on the date it was implanted: to prevent adhesion formation at the incision site. This therapeutic purpose does not disappear simply because the barrier was not timely removed.

¶ 37 Plaintiff characterizes her argument as one about therapeutic purpose in order to create a factual dispute, but in fact, whether the Gore-Tex barrier was timely removed is a question of whether the Gore-Tex barrier had a therapeutic *effect*, not whether it had a therapeutic *purpose*. Even accepting that the barrier did not have a therapeutic *effect* in this case, the experts still agree that the Gore-Tex barrier at least initially served a therapeutic *purpose*. Because of the disjunctive "or" in the statute which "indicat[es] that the various members of the sentence are to be taken separately[,]" the barrier need only have a therapeutic purpose or a therapeutic effect

for the four-year statute of limitations to apply. Because the experts agree as to the therapeutic purpose of the Gore-Tex barrier, the dispute over whether the Gore-Tex barrier had a therapeutic effect after being left in Plaintiff's body for nearly 10 years does not change § 1-15(c)'s application in this case. Therefore, the trial court correctly concluded that the four-year statute of limitations applies as a matter of law.

¶ 38        Moreover, whether Defendant Yalcinkaya negligently failed to remove the barrier after two to eight weeks is a question that goes to the heart of the malpractice claim, but does not need to be resolved to determine whether the Gore-Tex barrier had a therapeutic purpose for determining the correct statute of limitations period. If an object lost its therapeutic *purpose*, as Plaintiff basically argues, because it did not actually have a therapeutic *effect* due to improper use, this would render the inclusion of a therapeutic purpose in the statute superfluous. If our legislature intended the object to both have a therapeutic purpose *and* effect in order to be exempt from applying the 10-year statute of limitations, then the legislature would have included the conjunctive "and" instead of the disjunctive "or" between "purpose" and "effect."

¶ 39        From a public policy and legislative intent perspective, the facts here seem precisely inapposite to what our legislature intended when drafting this 10-year outer limit for certain foreign object malpractice claims. Our Supreme Court, in the res ipsa loquitor context, has previously described "foreign bodies" as instruments "such

as sponges, towels, needles, glass, etc., [] introduced into the patient's body during surgical operations and left there." *Mitchell v. Saunders*, 219 N.C. 178, 182, 13 S.E.2d 242, 245 (1941). We believe our legislature had a similar definition in mind when enacting the 10-year statute of limitations for foreign objects.

¶ 40        Previously, the 10-year statute of limitations has been discussed by this Court in a scenario where a surgical instrument, a drain, was accidentally left in the plaintiff's body. *Hensell v. Winslow*, 106 N.C. App. 285, 287, 416 S.E.2d 426, 428 (1992). In *Hensell*, the plaintiff sought damages for the defendant's "failure to remove a nontherapeutic nondiagnostic foreign object (drain) from her body at the close of surgery." *Id.* at 288, 416 S.E.2d at 428. The defendants asserted the statute of limitations as an affirmative defense, because more than four years had passed and the plaintiff did not bring suit within one year of discovering the drain. *Id.*, 416 S.E.2d at 429. This Court discussed in depth what constituted "discovery" for purposes of the statute's qualification that the suit must be brought within one year of discovering the foreign object, and ultimately held that the statute of limitations barred her claim. *Id.* at 288-89, 416 S.E.2d at 429.

¶ 41        However, the 10-year statute of limitations has not been applied in a case such as this one, where a medical implant had been purposefully placed and left in a plaintiff's body during surgery as part of a medical treatment. In fact, only one other North Carolina case grapples with a similar Gore-Tex barrier implant, *Locklear v.*

*Lanuti*, 176 N.C. App. 380, 626 S.E.2d 711 (2006). In *Locklear*, the plaintiff alleged that the defendant doctor was negligent in repairing her hernias with a "Gortex mesh[.]" *Id.* at 386, 626 S.E.2d at 716. The defendant raised the affirmative defense of statute of limitations because the plaintiff filed suit more than three years after the defendant's last act. *Id.* at 384, 626 S.E.2d at 715. The plaintiff argued that the statute of limitations should be tolled under the continuing treatment doctrine, but did not argue that the 10-year exception for foreign objects should apply. *Id.*, 626 S.E.2d at 715. Therefore, this Court did not consider whether the Gore-Tex barrier fell under the 10-year foreign object statute of limitations, but remanded the case for consideration of the continuing course of treatment doctrine. *Id.* at 387, 626 S.E.2d at 716.

¶ 42 Here, the Gore-Tex barrier was purposefully implanted by Defendant Yalcinkaya with the purpose of decreasing post-surgical pelvic adhesions on the surgical incision site. This case is unlike *Hensell* where the defendant accidentally left a surgical drain in the plaintiff's body that was discovered many years later after causing health complications. For statutory construction and public policy reasons, and because Defendant Yalcinkaya implanted the Gore-Tex barrier intending that it be permanently implanted, we decline to hold that a purposeful medical implant that initially serves a therapeutic purpose but potentially later has a non-therapeutic effect requires application of the 10-year statute of limitations period for foreign

objects. To do so would allow any therapeutic device implant, whether a Gore-Tex barrier, cardiac stent, pacemaker, knee replacement, etc., to be subject to the 10-year statute of limitations if an expert testifies that at some point during the 10-year period it became non-therapeutic. We do not believe this is what our legislature intended by enacting § 1-15(c), and therefore affirm the trial court's application of § 1-15(c) and grant of summary judgment on the medical malpractice issue.

**E. Punitive Damages**

North Carolina follows the general rule that "punitive damages do not and cannot exist as an independent cause of action, but are mere incidents of the cause of action." *Iadanza v. Harper*, 169 N.C. App. 776, 783, 611 S.E.2d 217, 223 (2005) (internal marks and citation omitted). *See also Funderburk v. JPMorgan Chase Bank, N.A.*, 241 N.C. App. 415, 425, 775 S.E.2d 1, 8 (2015) ("[A] claim for punitive damages is not a stand-alone claim."). Therefore, because we hold that the trial court properly granted summary judgment on each of Plaintiff's claims above, Plaintiff has no independent basis for punitive damages and this claim necessarily fails.

## III.    Conclusion

For the foregoing reasons, we affirm the trial court's grant of summary judgment in favor of Defendants.

AFFIRMED.

Chief Judge STROUD and Judge ARROWOOD concur.