Futures Grp., Inc. v. Brosnan, 2022 NCBC 79.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 7106

THE FUTURES GROUP, INC. and
GEOFF G. CRAMER,

Plaintiffs,

v.

DENIS BROSNAN,

Defendant.

**ORDER AND OPINION ON PLAINTIFF FUTURES GROUP, INC.'S RULE 12(b)(6) MOTION TO DISMISS DEFENDANT DENIS BROSNAN'S FIRST AND SECOND CLAIMS FOR RELIEF**

1. **THIS MATTER** is before the Court on Plaintiff Futures Group, Inc.'s Rule 12(b)(6) Motion to Dismiss Defendant Denis Brosnan's First and Second Claims for Relief ("Motion"), (ECF No. 47).

2. Having considered the Motion, the related briefs, and the arguments of counsel at a hearing on the Motion, the Court hereby **DENIES** the Motion.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Walter L. Tippett, Jr., Jimmy C. Chang, and Lindsey S. Barber, for Plaintiff Futures Group, Inc.*
>
> *Sigmon Law, PLLC, by Mark R. Sigmon, for Plaintiff Geoff G. Cramer.*
>
> *Miller Monroe & Plyer, PLLC, by Jason A. Miller, Paul Flick, and John W. Holton, for Defendant Denis Brosnan.*

Earp, Judge.

## I. INTRODUCTION

3. The deleterious effects that souring family relationships can have on a business are evident in this case. In 2005, Geoff G. Cramer ("Cramer") founded a technology and consulting services company, now known as The Futures Group, Inc.

("Futures" or "the Company"). In 2008, Cramer married Aimee Brosnan ("Aimee"), who became Futures' corporate secretary.

4. Even before Cramer and Aimee were wed, Aimee's father, Denis Brosnan ("Brosnan"), became the Company's lender. Throughout the years, Brosnan loaned either Cramer or the Company several million dollars.

5. Over time, Cramer and Aimee's marriage fell into disrepair, and in March 2020, Cramer left the marital home. Divorce proceedings followed. This action, reflecting significant disagreement among the parties regarding both the repayment of Brosnan's loans and the ownership of Futures, also followed. Futures and Cramer (collectively, "Plaintiffs") have sued Brosnan, seeking a declaratory judgment, damages, and attorneys' fees. In response, Brosnan has asserted multiple counterclaims against Futures. This Motion seeks dismissal of two of those counterclaims.

## II. FACTUAL AND PROCEDURAL BACKGROUND

6. The Court does not make findings of fact when ruling on a motion to dismiss. It recites below those factual allegations in the counterclaims that are relevant and necessary to the Court's determination of the Motion.

7. Brosnan is an Irish citizen who moved to the United States with his daughter Aimee in 2001. (Answer First Am. Compl. & Counterclms. ¶ 7 ["Counterclm."], ECF No. 30.)

8.    Cramer is a citizen and resident of Wake County, North Carolina.  He is the founder and CEO of Futures.  Cramer married Aimee on 1 November 2008. (Counterclm. ¶¶ 3, 8–11.)

9.    Futures is a Delaware corporation with its principal place of business in Wake County, North Carolina.  Before changing its name in 2007, Futures was known as The Talent Group, Inc.  Futures offers technology development and consulting services. (Counterclm. ¶¶ 2, 10.)

10.    In late 2006, at Cramer's request, Brosnan agreed to loan Futures money in exchange for a convertible revolving promissory note (the "Note") in the principal sum of $800,000.  Thereafter, Brosnan continued to loan money pursuant to the Note, and the principal eventually reached $1,500,000.  (Counterclm. ¶¶ 12–14.)

11.    In 2008, Brosnan and Cramer discussed converting some of the debt secured by the Note into Futures' shares.  To that end, Cramer directed Futures' Secretary to create, stamp, and sign a share certificate.  However, no agreement on the conversion was reached and, as a result, Cramer had Futures' corporate secretary mark the stock certificate "Cancelled – Not Executed[.]"  (Counterclm. ¶¶ 16–17.)

12.    In 2009, Brosnan and Futures, acting through its Board of Directors (the "Board"), agreed by letter agreement to modify the Note (the "Modification").  In pertinent part, the Modification increased the maximum principal, ratified and confirmed the existing principal of $1,500,000, converted $915,000 of the then-existing principal into 7,875,000 shares of Futures' Class A Common Stock, and extended the maturity date on the remaining balance to 31 January 2010.  Except as

amended by the Modification, the terms of the Note as originally executed remained in full force and effect. (Counterclm. ¶¶ 18–19.)

13. Specifically, the following provision in the Note was not modified:

> On the Maturity Date, the unpaid principal balance together with outstanding interest allocable thereto, *shall, in lieu of repayment in cash, be converted into shares* of the Company's Class A Common Stock at a price per share equal to the fair market value of the Common Stock as of the date of conversion.

(Counterclm. ¶ 19 (emphasis added).)

14. On the maturity date, 31 January 2010, the outstanding balance due under the Note was $659,484.36. However, despite the existence of an appraisal done in 2008 and a second appraisal done in June 2011, both valuing the stock at $0.01 a share, Futures and Brosnan were unable to agree on the fair market value of Futures' shares. (Counterclm. ¶¶ 25–29.) Nevertheless, Brosnan understood that the debt automatically converted to 65,948,436 shares of Futures' Class A Common Stock on 31 January 2010, the maturity date of the Note. (Counterclm. ¶ 31.)

15. Brosnan never received a share certificate for these shares, and the transaction was not recorded in Futures' corporate records. (Counterclm. ¶¶ 30–33.)

16. In the years following, Brosnan continued to loan money to Futures "on an *ad hoc* basis as requested by Futures under an oral agreement that Futures would repay the loans in a reasonable period of time when it was able to stabilize its operations and produce positive cash flow." (Counterclm. ¶ 37.)

17. "In or about November 2017," Cramer and Brosnan discussed another arrangement where Futures would issue 7,000,000 shares of Futures' stock as partial

compensation for the "*ad hoc* loans" Brosnan made to Futures. Although Cramer directed Aimee to prepare a share certificate, it was never issued or delivered to Brosnan. Even so, Brosnan believed that the shares were issued to him. (Counterclm. ¶¶ 37–43, 46.)

18. In 2018, Brosnan, Aimee, and Cramer began discussing Brosnan's estate plan. During those discussions, Brosnan agreed to convey 7,000,000 shares to Cramer and separately to convey 7,875,000 shares to Aimee for a price of $0.001 a share. (Counterclm. ¶ 46.)

19. Cramer never paid for the 7,000,000 shares that were to be conveyed to him. Instead, Aimee paid Brosnan the full amount of $14,875 from her separate funds for both conveyances. After Aimee paid Brosnan, Futures issued 6,875,000 shares to Aimee and 500,000 shares to each of her sons. (Counterclm. ¶¶ 45–50.) And, even though he did not pay for his shares, Brosnan alleges that Cramer directed Aimee to prepare a stock certificate issuing 7,000,000 shares, which he then signed and issued to himself. (Counterclm. ¶ 50.)

20. In March 2020 Cramer and Aimee separated, and Brosnan began to investigate Cramer's actions regarding Futures. Brosnan "learned that Cramer had misrepresented and concealed materials [sic] facts from him to fraudulently induce him into conveying [the 7,000,000 shares] to Cramer" during the estate planning process. (Counterclm. ¶¶ 51–52.)

21. Later in the year, Brosnan presented his findings and a "detailed reconciliation . . . of all amounts owed to him" to Futures' Board. (Counterclm. ¶ 54.)

Brosnan asked the Board to begin repaying Futures' debt to him, and he "demanded that the Board take action to invalidate the 2018 conveyance of the [7,000,000 shares]" to Cramer. (Counterclm. ¶ 56.) Brosnan also notified the Board that he never "received shares or a stock certificate to reflect" the January 2010 conversion of the $659,484.36 balance of the Note to Futures stock. (Counterclm. ¶ 57.)

22. On 21 December 2020, after conferring with Futures' counsel, Futures' Board member Bruce Culver ("Culver") determined that Brosnan was "still owed the $655,000 under the original note. Plus the additional capital that [Brosnan] provided the Company over the years." (Counterclm. ¶ 59.)

23. Culver and fellow Board member Rolf Kleiner ("Kleiner") acknowledged to Brosnan that Futures still owed him the debt pursuant to the Note, as well as all of the additional amounts Brosnan had loaned the Company over the years. However, they declined to act with respect to the 2018 conveyance of 7,000,000 shares, deeming that part of his complaint a "family matter." (Counterclm. ¶ 58.)

24. Therefore, on 5 January 2021, Culver, on behalf of Futures, sent Brosnan by email a proposed promissory note ("Proposed Note") in the amount of $5,682,852.00. The accompanying message stated that the Proposed Note "consolidates the loans you made to Futures over the years, plus interest." The email was signed, "Thank you, Bruce." (Counterclm. ¶ 60.)

25. However, the Proposed Note also included a provision that required Brosnan "to waive a portion of the amount owed to him and attempted to eliminate [Brosnan's] right to shares under the conversion provisions of the Convertible Note."

(Counterclm. ¶ 61.) Brosnan raised these two issues with Culver. Culver responded by claiming that the waiver provisions must have been inserted in error. (Counterclm. ¶ 62.)

26. After this conversation, Culver sent an email offering a revised proposal ("Revised Proposed Note") on 23 January 2021. The Revised Proposed Note again included a provision waiving both a portion of the amount owed, as well as the right to conversion under the Note. Culver represented that the Revised Proposed Note was "a further revised note draft to memorialize the money and interest that [Brosnan has] loaned to Futures over the years." This email was signed, "All the best, Bruce." (Counterclm. ¶ 63–64.)

27. Brosnan declined to sign either the Proposed Note or the Revised Proposed Note. (Counterclm. ¶ 65.)

28. According to Brosnan, Futures' Board retaliated against him for (1) refusing to waive a portion of the debt owed, (2) refusing to relinquish his conversion rights under the Note, and (3) insisting that the Board take action to invalidate the 2018 transfer of 7,000,000 shares. Cramer, Culver, and Kleiner voted to remove Brosnan from Futures' Board on 23 March 2021. The Board then voted to remove Aimee as corporate secretary the next day. (Counterclm. ¶ 66–67.)

29. On 24 May 2021, Plaintiffs filed their Complaint, (ECF No. 3). They amended it on 6 October 2021, (ECF No. 13). Brosnan subsequently filed his Answer to the First Amended Complaint and Counterclaims ("Counterclaim"), (ECF No. 30), on 13 December 2021.

30. Plaintiffs responded with this Motion on 11 February 2022, seeking to dismiss the First and Second Counterclaims. The Motion has been fully briefed and a hearing on the Motion was held on 30 August 2022 during which all parties were present and heard. (*See* ECF No. 78.) The Motion is now ripe for disposition.

## III. LEGAL STANDARD

31. On a Rule 12(b)(6) motion to dismiss, the "question before us is whether, as a matter of law, the allegations of the [counterclaim], treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Gant v. NCNB Nat. Bank*, 94 N.C. App. 198, 199 (1989); *accord Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 649 (2009).

32. Under North Carolina's notice pleading standard, "a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of *res judicata*, and to show the type of case brought." *Sutton v. Duke*, 277 N.C. 94, 102 (1970) (internal quotation marks omitted).

33. Dismissal of a claim is proper "(1) when the [counterclaim] on its face reveals that no law supports [counter-claimant's] claim; (2) when the [counterclaim] reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the [counterclaim] necessarily defeats the [counter-claimant's] claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278 (1985). A counterclaim will not be "dismissed for insufficiency unless it appears to a certainty that [counter-claimant] is

entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton*, 277 N.C. at 103 (emphasis omitted).

34. "A statute of limitations defense may properly be asserted in a Rule 12(b)(6) motion to dismiss if it appears on the face of the [counterclaim] that such a statute bars the claim." *Horton v. Carolina Medicorp*, 344 N.C. 133, 136 (1996). When a statute of limitations defense is raised, "the burden of showing that the action was instituted within the prescribed period is on the [counter-claimant]." *Id.*

35. The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir., 2002)). However, the Court must construe the counterclaims liberally and treat all allegations as true for purposes of ruling on the Motion. *See Laster v. Francis*, 199 N.C. App. 572, 577 (2009).

## IV. ANALYSIS

36. At issue are the First and Second Counterclaims brought by Brosnan against Futures, both relating to the Note. Futures has moved to dismiss the claims, contending that they are barred by the statute of limitations.

37. For his First Counterclaim, Brosnan asks the Court to: (a) declare that as of 31 January 2010, the outstanding balance on the Note ($659,484.36) automatically converted to 65,948,436 shares of Futures' Class A Common stock at a price of $0.01 per share, and (b) order Futures to issue a share certificate reflecting the same.

Alternatively, if the Court does not find that the conversion happened on 31 January 2010, Brosnan seeks an order compelling Futures to convert the balance of the Note to 65,948,436 shares and issue those shares to Brosnan. (Counterclm. ¶¶ 70–75.)

38.     For his Second Counterclaim, Brosnan avers in the alternative that Futures has breached the provisions of the Note, entitling him to damages. (Counterclm. ¶¶ 83–90.)

39.     Futures argues that both the First and Second Counterclaims are barred by the three-year statute of limitations for breach of contract. It claims that the allegations are that it breached its obligations on the Note's maturity date, 31 January 2010. If so, Futures argues, the statute of limitations on these claims expired three years later on 31 January 2013, and the claims are now time-barred.

40.     Moreover, Futures contends that Brosnan's own allegations reveal that he knew or should have known that Futures was in breach of the Note on 31 January 2010. Futures claims the alleged breach was evident because Brosnan and Cramer disputed the fair market value of the shares, and because Brosnan never received a share certificate even though the Note expressly required the issuance and delivery of one. Thus, Futures argues that Brosnan's allegations establish that the statute of limitations with respect to the First and Second Counterclaims expired long before the claims were initiated in December 2021. (Br. Supp. Pl.'s Mot. Dismiss 13–18 ["Pl.'s Br."], ECF No. 50 (citing ECF No. 49, Ex. A – Convertible Note, Section 3(c)).)

41.     In response, Brosnan argues that he has sufficiently alleged that he did not know, nor should he have known, that Futures was in breach of the Note on 31

January 2010. Instead, Brosnan alleges that the provision requiring conversion of the debt to stock was self-executing, that no action was "necessary to effectuate this conversion[,]" and that he only became aware that "Futures rejected his ownership rights for the first time in December 2020" (when he received Culver's email). (Mem. Opp. Pl. Partial Mot. Dismiss 4 ["Def.'s Opp. Br."], ECF No. 56.)

42. Alternatively, Brosnan highlights paragraphs 54–67 of his pleading in which he alleges that Futures, through its actions after the expiration of the three-year statute of limitations on 31 January 2013, acknowledged its obligations to him, both under the Note, as well as for the additional *ad hoc* loans. Citing N.C.G.S. § 1-26, Brosnan asserts that this acknowledgement by Futures served to revive its obligations under the Note.

43. The applicable statute of limitations for a breach of contract claim is three years pursuant to N.C.G.S. § 1-52(1). The statute applies to the breach of a promissory note. *See Nance v. Hulin*, 192 N.C. 665, 666 (1926) (a claim for breach of contract on a note has a three-year statute of limitations); *Ussery v. Branch Banking & Trust Co.*, 368 N.C. 325, 333 n.5 (2015) (breach of contract claim on a note is subject to three-year statute of limitations); *see generally Reidsville v. Burton*, 269 N.C. 206, 211 (1966); *Thurston Motor Lines v. General Motors Corp.*, 258 N.C. 323, 325 (1962).

44. The same statute of limitations applies to the declaratory judgment claim. *Chisum v. Campagna*, 376 N.C. 680, 718–19 (2021) (the applicable statute of limitations for declaratory judgment actions is the one associated with the

substantive claim that most closely approximates the basis for the requested declaration) (collecting cases).

45. "A claim for breach of contract accrues when the plaintiff knew or should have known that the contract had been breached[.]" *Chisum*, 376 N.C. at 720; *accord Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5–6 (2017) ("We have long recognized that a party must initiate an action within a certain statutorily prescribed period after *discovering its injury* to avoid dismissal of a claim." (emphasis added)); *Black v. Littlejohn*, 312 N.C. 626, 639 (1985) ("a statute of limitations should not begin running against plaintiff until plaintiff has knowledge that a wrong has been inflicted upon him.").

46. Therefore, to determine whether Brosnan's claims are time-barred, the Court must first determine whether his allegations, assumed to be true and construed favorably to Brosnan, could *only* lead to the conclusion that Brosnan knew or should have known more than three years before filing his counterclaims that Futures was in breach of the Note. If another inference could be drawn from the allegations, a decision to dismiss would be premature. *Cf. Little v. Rose*, 285 N.C. 724, 727 (1974) ("Where, however, the evidence is sufficient to support an inference that the cause of action is not barred, the issue is for the jury.").

47. In this case, Brosnan's pleading contains allegations that, viewed in the light most favorable to him, could support an inference that Brosnan neither knew nor should have known that Futures breached its obligations on the Note until Futures, through its Board member Culver, told him that the Company did not intend

to convert the debt to stock in December 2020. Brosnan alleges that Culver's December 2020 email explained that Futures' counsel had (improperly) determined that the Note "permitted a single conversion event" which had already occurred in 2009; therefore, the debt was to be paid in cash, not stock. (Counterclm. ¶ 59.)

48. Brosnan repeatedly alleges that the Note provided for "automatic" conversion on 31 January 2010 with no action on his part. (Counterclm. ¶¶ 20, 70, 76.) He also asserts that his dealings throughout the years with respect to this debt were with Cramer, his son-in-law, with whom he had a relationship of trust and confidence. (Counterclm. ¶ 151.) He contends that Cramer has taken advantage of the trusting family relationship. (Counterclm. ¶¶ 145, 152(h).)[1]

49. Viewing the totality of the allegations in Brosnan's pleading in the light most favorable to Brosnan, he has sufficiently pled that he did not know, nor should he have known, that the debt conversion did not take place on 31 January 2010. Whether the evidence will support his contention "is a question for a different day . . . . on a more developed record." *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at \*53 (N.C. Super. Ct. Dec. 31, 2019) (citing *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 486 (2004) ("determining when plaintiff should, in the

---

[1] Futures argues that Brosnan's allegations with respect to the trust he had in Cramer have to do with the transfer of the 7,000,000 shares, not the convertible Note. Therefore, it contends, Brosnan has not pled that Cramer abused his trust with respect to the Note. The law does not require Brosnan to dice his claims so finely. *See e.g., Barnes v. Perry*, 2018 NCBC LEXIS 262, \*\*25–26 (N.C. Super. Ct. July 30, 2018) (citing *Perez v. Perez*, 2018 N.C. App. LEXIS 211, at \*5–6 (Mar. 6, 2018) (unpublished) (a court is permitted to view the complaint as a whole; the practice of separating each claim is nowhere required by law and "may simply be a practice that developed for clarity and ease of reading")).

exercise of reasonable care and due diligence, have discovered the [alleged injury] is a question of fact to be resolved" at a later time)).

50. Brosnan's second argument is that even if the statute of limitations ran on a claim for breach of the Note, Futures' acknowledgement of its obligations on the Note revived the debt pursuant to N.C.G.S. § 1-26. (Def.'s Opp. Br. 14–17.) Futures responds that the writings identified in the counterclaim do not meet the requirements of § 1-26. It argues that the statute requires that debt acknowledgements "(1) identify the nature and amount of the debt and (2) manifest a definite and unqualified intention to pay the debt." (Reply Supp. Pl.'s Mot. Dismiss 9 ["Pl.'s Reply Br."], ECF No. 58.)

51. The statute reads: "No acknowledgment or promise is evidence of a new or continuing contract, from which the statutes of limitations run, unless it is contained in some writing signed by the party to be charged thereby; but this section does not alter the effect of any payment of principal or interest." N.C.G.S. § 1-26.

52. For an acknowledgement to restart the limitations period, "there must be a distinct and unequivocal acknowledgment of the debt as still subsisting as a personal obligation of the debtor." *Phillips v. Giles*, 175 N.C. 409, 413 (1918). "A mere acknowledgment, though in writing, of the debt as having once existed, is not sufficient to raise an implication of such a new promise." *Id.*

53. Reviewing the allegations of Brosnan's pleading, the Court first determines that neither the Proposed Note nor the Revised Proposed Note meet the requirements of § 1-26. Even though both proposals were in writing and appear to be electronically

signed[2], they are not distinct and unequivocal acknowledgments of the debt. Both proposals required Brosnan "to waive a portion of the amount owed to him and attempted to eliminate [Brosnan's] right to shares under the conversion provisions of the Convertible Note." (Counterclm. ¶ 64.) Therefore, these writings constitute offers to engage in negotiations to settle a debt rather than acknowledgements of a subsisting debt obligation.

54. Further, Brosnan alleges that he declined both proposals because he "obviously could not agree to waive the debts owed to him or give up his right to shares[.]" (Counterclm. ¶ 65.) Thus, neither of Futures' two proposals, both rejected by Brosnan, can serve as the definite and unequivocal written and signed acknowledgement of Futures' obligations that is required by N.C.G.S. § 1-26. *See American Multimedia, Inc. v. Freedom Distrib., Inc.*, 95 N.C. App. 750, 752 (1989) (conditional expressions of a willingness to pay were not sufficiently precise); *Long v. Oxford*, 104 N.C. 408, 409 (1889) (promise must be certain on its terms); *Pool v. Bledsoe*, 85 N.C. 1, 2 (1881) ("the promise must be identical and between the original parties") (citing *Fleming v. Staton*, 74 N.C. 203 (1876)).

55. In paragraph 58 of his pleading, Brosnan broadly alleges that "Board members Bruce Culver and Rolf Kleiner acknowledged that Futures still owed the

---

[2] The North Carolina Uniform Electronic Transactions Act ("Act"), N.C.G.S. § 66-311 *et seq.*, sets forth the requirements for conducting transactions by electronic means when the parties to the transaction agree to do so. Among other things, the Act provides that "[a] record or signature may not be denied legal effect or enforceability solely because it is in electronic form." N.C.G.S. § 66-317(a). The Act defines an "Electronic signature" as "an electronic sound, symbol, or process attached to, or logically associated with, a record and executed or adopted by a person with the intent to sign the record." N.C.G.S. § 66-312(9).

debt to [Brosnan] under the Convertible Note." (Counterclm. ¶ 58.) Similarly, in paragraph 59, Brosnan asserts that "Futures Board member Bruce Culver indicated that he had conferred with Futures' counsel and determined that 'you are still owed the $655,000 under the original note.' " (Counterclm. ¶ 59.) However, in neither instance does Brosnan allege that these acknowledgements were in writing or signed. Consequently, these communications cannot satisfy N.C.G.S. § 1-26.[3]

56. Accordingly, the Court determines that the requirements of N.C.G.S. § 1-26 have not been pled. Nevertheless, a determination of when the claims accrued for purposes of the statute of limitations requires a more developed record to resolve.

57. The Court therefore **DENIES** the Motion.

## V. CONCLUSION

58. For the foregoing reasons, Plaintiff Futures Group, Inc.'s Rule 12(b)(6) Motion to Dismiss Defendant Denis Brosnan's First and Second Claims for Relief is **DENIED**.

IT IS SO ORDERED, this the 7th day of December, 2022.

/s/ Julianna Theall Earp
—————————————————
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases

---

[3] Paragraph 89 does not provide the necessary support either. There, Brosnan alleges in conclusory fashion, "Futures . . . acknowledged the debt in multiple signed writings[.]" (Counterclm. ¶ 89.) This conclusion is not supported by the factual allegations. *See Good Hope Hosp., Inc.*, 174 N.C. App. at 274 ("We are not required, however, 'to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.' " (quoting *Veney*, 293 F.3d at 730)).